665 F.2d 918
 27 Fair Empl.Prac.Cas. 1273,
28 Fair Empl.Prac.Cas. 1820,
28 Empl. Prac. Dec. P 32,404
Floyd W. WILLIAMS, Jr., et al., Plaintiffs/Cross-Appellees,
Alice Brice, Plaintiff/Appellant/Cross-Appellee,
Robert Harold and Aunita Jones,
Plaintiff-Intervenors/Appellants/Cross-Appellees,
and
Charlotte Harris, et al., Plaintiff-Intervenors/Cross-Appellees,
v.
OWENS-ILLINOIS, INC., Defendant/Appellee/Cross-Appellant.
 No. 79-4410.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1981.
Decided Jan. 11, 1982.
 
 G. Todd Withy, Berkley, Cal., argued for plaintiff/appellant/cross-appellee; Ann Hill, San Francisco, Cal., on brief.
 Raymond Baca, E.E.O.C., Washington, D. C., argued for defendant/appellee/cross-appellant; Marvin D. Morgenstein, Steinhart, Falconer & Morgenstein, San Francisco, Cal., Lloyd Sutter, Toledo, Ohio, on brief.
 Appeal from the United States District Court for the Northern District of California.
 Before TANG and CANBY, Circuit Judges, and WILLIAMS,* District Judge.
 CANBY, Circuit Judge.
 
 
 1
 This action was brought by twelve named plaintiffs representing themselves and a class of current and former black and female employees of Owens-Illinois' Oakland glass container plant. They alleged that the company's employment and promotion practices violated Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 and Executive Orders 11246 and 11375. In addition to their individual claims, appellants asserted classwide claims of discrimination by race or sex in hiring, initial job assignments, transfers and promotions. They also alleged discriminatory harassment and discharge. They sought injunctive relief, back pay and compensatory and punitive damages. Following a lengthy trial, the jury found in favor of only three individual plaintiffs on their § 1981 claims. On issues tried to the court with the advice of the jury, the district court rejected the class race claims and found sex discrimination only with regard to initial hiring for management training positions and promotions into supervisory and managerial positions. 469 F.Supp. 70, 74, 77 (N.D.Cal.1979). Appellants, the three individuals who prevailed below, limit their appeal to issues relating to the class actions. They assert numerous errors concerning pretrial proceedings, the trial itself, the remedial order and the award of attorneys' fees.
 
 
 2
 * The Oakland plant is located on the edge of Alameda County. During the 1971-78 period, it employed between 1600 and 2000 workers. Employees produce, pack and ship glass bottles, make the cartons in which the bottles are packed and administer the operation. "Selectors" inspect the glass and place acceptable bottles in cartons. "Lehr attendants" stack the filled cartons on pallets. The packed bottles are kept in the warehouse and eventually delivered by drivers working in the trucking department. The plant also has a maintenance department and a central mold shop, where molds are produced for use in a number of Owens-Illinois glass bottle plants.
 
 
 3
 The plant is organized into 20 departments which are grouped into five general areas (production, finished products, packaging and distributing, administration and other). Four of the departments, employing approximately 10% of the workers, are composed entirely of salaried employees. The remaining 16 departments employ hourly workers who belong to various unions and whose wages, hours and terms of employment are controlled by collective bargaining agreements.
 
 
 4
 Seven named plaintiffs filed suit on behalf of themselves and similarly situated blacks and women in June 1975. They alleged that Owens-Illinois had discriminated against them in violation of Title VII, 42 U.S.C. § 1981 and Executive Orders 11246 and 11375. Five additional plaintiffs subsequently intervened. Shortly before trial, the court certified two classes: blacks employed at the plant after March 7, 1971 and women employed there after March 23, 1974. The court ruled that any earlier claims were time-barred. It further ruled that because the unions were not parties to the suit, any actions by Owens-Illinois which were undertaken in compliance with independently entered collective bargaining agreements would not provide the basis for any claim of discrimination. The trial court granted summary judgment to Owens-Illinois on appellants' executive order claims. Appellants do not challenge this last ruling on appeal. The court left for trial individual and class race claims which were based on 42 U.S.C. § 1981 and Title VII as well as individual and class sex discrimination claims brought pursuant to Title VII.
 
 
 5
 The § 1981 individual claims were tried to a jury which also considered the class claims in an advisory capacity. The trial court rejected appellants' contention that the jury be permitted to determine compensatory and punitive class damages pursuant to § 1981. The court held that because the class was certified under Federal Rule of Civil Procedure 23(b)(2), recovery was limited to equitable relief. The court consequently struck the prayer for compensatory and punitive class relief.
 
 
 6
 The jury found against seven of the eleven named plaintiffs[1]. It found in favor of three plaintiffs and disagreed as to one. In its advisory capacity the jury split six to three in the company's favor on the issue of black class liability and found discrimination against women only in promotions to management positions and placement in supervisory and management training jobs. The trial court entered judgment in accordance with the jury's verdict on the individual claims and the jury's recommendations on the class actions.
 
 
 7
 The court entered a remedial order requiring the company to implement new policies for the promotion of women to supervisory and management positions. The court rejected, however, appellants' request for specific affirmative action goals. The court ordered that all back pay claims of the female class be heard by a magistrate, but directed that the magistrate deny relief to any class member whose claim could have been addressed through the grievance procedure established by the collective bargaining agreements.
 
 
 8
 The court also rejected appellants' request for approximately $650,000 in attorneys' fees. It awarded $50,000, which it concluded was more than adequate compensation.
 
 II
 Pre-trial Rulings: Continuing violations
 
 9
 In a class action, a class representative's EEOC complaint tolls the statute of limitations for all class members. Inda v. United Air Lines, Inc., 565 F.2d 554, 559 (9th Cir. 1977), cert. denied, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed. (1978). The trial court established the limitations period for the two classes by subtracting the 180 day statute of limitations for filing with the EEOC from the date of the first EEOC complaint filed by a member of each class. The court therefore concluded that claims of sex discrimination based on acts prior to March 1974 and of race discrimination based on acts prior to March 1971 were time-barred.[2] The court rejected the continuing violation doctrine as inapplicable.
 
 
 10
 The doctrine of continuing violations, as one court observed, is "actually a conglomeration of several different ideas." Elliott v. Sperry Rand Corp., 79 F.R.D. 580, 585 (D.Minn.1978). For present purposes, however, the relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period. Id. at 585-86. The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period. Such continuing violations are most likely to occur in the matter of placements or promotions. A minority employee who is not promoted in 1973, for example, and is subject to a continuing policy against promotion of minorities, may then file a timely charge in 1976, because the policy against promoting him or her continued to violate the employee's rights up to the time the charge was filed. With regard to such discrimination in promotion, this court has accepted the following formulation:
 
 
 11
 (A) challenge to systematic discrimination is always timely if brought by a present employee, for the existence of the system deters the employee from seeking his full employment rights or threatens to adversely affect him in the future.
 
 
 12
 Reed v. Lockheed Aircraft Corp., 613 F.2d 757, 761 (9th Cir. 1980), quoting Elliott v. Sperry Rand Corp., 79 F.R.D. at 586; accord, Higgins v. Oklahoma ex rel. Oklahoma Employment Security Comm'n, 642 F.2d 1199, 1200 n.2 (10th Cir. 1981); Clark v. Olinkraft Inc., 556 F.2d 1219, 1221-22 (5th Cir. 1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978); Rich v. Martin Marietta Corp., 522 F.2d 333, 348 & n.15 (10th Cir. 1975); Wetzel v. Liberty Mutual Life Ins. Co., 508 F.2d 239, 246 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).
 
 
 13
 The situation may be different, however, with regard to complainants who have ceased to be employees or never were employees. A refusal to hire or a decision to fire an employee may place the victim out of reach of any further effect of company policy, so that such a complainant must file a charge within the requisite time period after the refusal to hire or termination, or be time-barred. If in those cases the victims can show no way in which the company policy had an impact on them within the limitations period, the continuing violation doctrine is of no assistance or applicability, because mere "continuing impact from past violations is not actionable. Continuing violations are." Reed v. Lockheed Aircraft Corp., 613 F.2d at 760; see United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).
 
 
 14
 We agree with the trial court that in this case Owens-Illinois' refusals to hire and terminations did not give occasion to apply the continuing violations doctrine. Claims based on discriminatory refusals to hire or on terminations occurring before the limitations period were therefore properly excluded.
 
 
 15
 The trial court erred, however, in concluding that the continuing violations doctrine did not apply to discriminatory placements or denials of promotions. It should not have barred consideration of such events that may have occurred prior to the limitations period. The reason is that appellants were entitled to base claims on such discriminatory acts if they could show that these acts continued as violations because the supporting discriminatory policy carried forward into the limitations period and had its effect on employees. This opportunity to prove a continuing violation must be provided, of course, whether the claim is race or gender discrimination. Jenkins v. Home Insurance Co., 635 F.2d 310, 312 (4th Cir. 1980).
 
 
 16
 For reasons set forth below, remand of both the black class claims and most of the womens' class claims is necessary. On remand, evidence of discriminatory acts relating to placement or promotion of blacks and women occurring before the applicable limitations period may be admitted for the purpose of attempting to show continuing violations having an effect on the concerned employees within the limitations period.[3]
 
 III
 Race Claims
 
 17
 Appellants asserted race claims pursuant to both Title VII and 42 U.S.C. § 1981. They contend that they presented sufficient evidence to support a prima facie case.
 
 A. Title VII
 1. Prima Facie Case
 
 18
 The trial court properly discounted much of appellants' statistical evidence as unhelpful[4]. We conclude, however, that appellants presented sufficient evidence to establish a prima facie case of discrimination if the relevant labor market is one of those urged by appellants or is some other market of equivalent or greater minority representation. (See subdivision 2, following).
 
 
 19
 Appellants' statistical study representing the job classifications of 88% of all persons hired between 1971 and 1976 is instructive. That study showed that although blacks comprised 27% of the new hires most of the blacks hired were service workers. Another meaningful statistic was provided by Owens-Illinois. During the period April 1974 through April 1975, only 11% of the craftsmen hired were black.
 
 
 20
 We believe that Owens-Illinois failed to rebut the statistical case presented by appellants. While the company did offer alternative studies, these did not negate the probative value of appellants' statistics. Indeed, Owens-Illinois' own study suggested that the percentage of blacks hired in craft positions was extremely low.
 
 
 21
 The company's primary defense was that many of its wage rates and promotion practices were mandated by collective bargaining agreements. In addition, Owens-Illinois claimed that several contracts eliminated its discretion in hiring by requiring the company to accept all employees referred by union hiring halls. The trial court ruled that any actions which the company undertook pursuant to union contracts would be deemed non-discriminatory, apparently because appellants had not brought the unions in as defendants. This ruling was erroneous as a matter of law.
 
 
 22
 An employer-union agreement permitting the employer to discriminate is not immune to race discrimination claims. "Rights established under Title VII ... are 'not rights which can be bargained away-either by a union, by an employer, or by both acting in concert.' " Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 447 (D.C.Cir.1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1977), quoting Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). "(U)nion pressure on an employer does not relieve the latter of its obligation to respect an applicant's Title VII rights ...." Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1016 (2d Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).[5]
 
 
 23
 The low percentage of blacks employed in certain areas of the plant suggests possible discrimination. Whether the studies in evidence establish a prima facie case, however, can be conclusively determined only by correlating these statistics with the corresponding percentage of blacks in the relevant geographic labor market. Unfortunately, for reasons to be stated now, the correlation between the Owens-Illinois work force and the relevant labor market can only be made upon remand.
 
 2. Relevant Labor Market
 
 24
 Appellants contend that the relevant market was either the population of Oakland or its labor force. In 1970, blacks comprised 40% of the Oakland population and 30% of the labor force. Owens-Illinois argues that the labor force of Alameda County was the relevant market. For the years 1973-78 blacks comprised only 13.6% of the Alameda County labor force. It is apparent, therefore, that whether or not a prima facie case of discriminatory impact was established is wholly dependent on whether Oakland is selected as the relevant labor market.
 
 
 25
 The trial court determined that Alameda County was the relevant market and accordingly appears to have held that appellants' statistics did not establish a prima facie case.[6] The court relied in large degree upon "zip code" data submitted by Owens-Illinois showing that its employees resided throughout Alameda County. Less than 50% of its new hires and only 34% of its total employees lived in Oakland. We conclude that the district court erred in selecting Alameda County as the relevant market on the basis of these data.
 
 
 26
 The zip code data, relied upon by the district court, do not prove that the Owens-Illinois' hiring practices were non-discriminatory. The data do indicate the geographic area from which the company hired its employees; they are not probative of whether Owens-Illinois actually hired its employees in non-discriminatory fashion from the available pool of labor. Indeed, the post hoc approach accepted by the trial court would permit an employer to limit the number of blacks employed by drawing his employees from predominantly white areas within commuting distance. See Markey v. Tenneco Oil Co., 635 F.2d 497, 499-500 (5th Cir. 1980). Because the district judge may have premised his conclusion that Owens-Illinois did not engage in discriminatory practices on this improper market determination, we reverse and remand the claims of the black class.[7]
 
 
 27
 We do not automatically accept, however, appellants' reasoning in support of their view that the relevant market is either the Oakland population or its labor force. These market definitions were initially adopted to determine whether Owens-Illinois was in compliance with the affirmative action goals of Executive Orders 11246 and 11375 and could therefore be awarded a government contract.[8]
 
 
 28
 While other factors may ultimately be found that will lead to selection of the Oakland population or labor force as the relevant market, we are reluctant to adopt a market definition solely on the ground that Owens-Illinois was willing to accept it in order to qualify for government contracts. We fear that such an approach would have a chilling effect on contract compliance and affirmative action. It is possible that Owens-Illinois would not have acceded to the government's definition had it been aware that an attendant consequence of its acquiescence would be to bind it to a particular definition of the market in subsequent non-related litigation.
 
 
 29
 On remand, it will be open for the trial court to determine the appropriate definition of relevant market, so long as that determination is not simply based on actual past hiring or Owens-Illinois' acceptance of a given definition for purposes of Executive Orders 11246 and 11375. One potentially more accurate indicator of the relevant market would be actual applicant (as opposed to hired worker) flow, at least where there is no evidence of systematic discouragement of minority applicants. See Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). These data would readily indicate what percentage of Owens-Illinois' applicants come from Oakland as opposed to other areas. See Hazelwood School District v. United States, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2741 n.13, 53 L.Ed.2d 768; Phillips v. Joint Legislative Committee, 637 F.2d 1014, 1025 (5th Cir. 1981); United States v. County of Fairfax, 629 F.2d 932, 940 (4th Cir. 1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981).
 
 
 30
 If these data are unavailable, the district court may accept any other reasonable proxy which indicates the source of Owens-Illinois' potential employees. One such proxy would be applicant data for a period subsequent to the one covered by this litigation. Cf. Heagney v. University of Washington, 642 F.2d 1157, 1165 (9th Cir. 1981) (study measuring conditions 22 months after appellant resigned is probative of conditions that existed when appellant was employed and therefore admissible). Unless the parties can show otherwise, we see no reason to assume that the source of Owens-Illinois' applicant pool has radically changed over time.
 
 B. § 1981 Claims
 1. Intent
 
 31
 Appellants and amicus Mexican American Legal Defense and Education Fund (MALDEF) assert that the trial court erred in ruling that employment discrimination claims brought pursuant to § 1981 require proof of intent. Although an open question when the parties filed their initial briefs, see Davis v. County of Los Angeles, 566 F.2d 1334, 1340 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 634, 99 S.Ct. 1379, 1384, 59 L.Ed.2d 642 (1979), this issue has been definitively determined by two recent decisions of this court. Craig v. County of Los Angeles, 626 F.2d 659, 668 (9th Cir. 1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981) and Golden v. Local 55, International Association of Firefighters, 633 F.2d 817, 823 (9th Cir. 1980), clearly establish that proof of intent is required.
 
 2. Jury Trial
 
 32
 Section 1981 provides both legal and equitable remedies. Johnson v. Railway Express Agency, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). The legal remedies include compensatory and punitive damages. See Claiborne v. Illinois Central Railroad, 583 F.2d 143, 154 (5th Cir. 1978), cert. denied, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); Sethy v. Alameda County Water District, 545 F.2d 1157 (9th Cir. 1976) (en banc). Accompanying these legal remedies is the right to trial before a jury. Setser v. Novack Investment Co., 638 F.2d 1137 (8th Cir. 1981); Moore v. Sun Oil of Pennsylvania, 636 F.2d 154 (6th Cir. 1980); cf. Shah v. Mt. Zion Hospital & Medical Center, 642 F.2d 268, 272 (9th Cir. 1981).
 
 
 33
 As part of their § 1981 claim, appellants sought both compensatory and punitive damages for the class of black employees. The trial court certified the class under Federal Rules of Civil Procedure 23(b)(2) and, while permitting a jury trial of individual damage claims, limited the class remedy solely to injunctive relief.[9] Appellants contend that their prayer for punitive and compensatory damages as a class was incidental to the request for injunctive class relief and therefore should have been permitted. Appellants further contend that they were entitled to a jury trial on their § 1981 claims, including their prayer for compensatory and punitive class relief. We disagree with both contentions.
 
 
 34
 It is true that this court has adopted the view that legal remedies which are incidental to a request for injunctive relief may be included as a part of the (b)(2) claim. Society for Individual Rights, Inc. v. Hampton, 528 F.2d 905, 906 (9th Cir. 1975); Elliot v. Weinberger, 564 F.2d 1219, 1228 (9th Cir. 1977); see Proposed Rules of Civil Procedure, Advisory Committee's Note to proposed Rule 23, 39 F.R.D. 98, 102 (1966) ((b)(2) designation not appropriate where "final relief relates exclusively or predominantly to money damages" (emphasis supplied)); 7A Wright & Miller, Federal Practice and Procedure § 1775, at 22-23 (1972).
 
 
 35
 It appears here, however, that the claimed compensatory damages were not necessarily compatible with class injunctive relief. Unlike back pay, compensatory damages are not subsumed by the traditional equitable concepts of reinstatement and restitution. More importantly, establishing the amount of compensatory damages due each plaintiff is a far more complex and uncertain exercise than the determination of back pay, and greatly complicates the management of the class action. "(I)t is within the discretion of the trial judge, under Rule 23(c)(4), to limit the issues in a class action to 'those parts of a lawsuit which lend themselves to convenient use of the class action motif.' " Society for Individual Rights, Inc. v. Hampton, 528 F.2d at 906, quoting Nix v. Grand Lodge, IAM, 479 F.2d 382, 385 (5th Cir.), cert. denied, 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973). In this instance we do not believe that the trial court abused its discretion in refusing to consider appellants' prayer for $50 million in punitive and compensatory damages as incidental to the request for injunctive relief.
 
 
 36
 Thus, the only requested remedy other than injunctive relief which was before the court was back pay. That relief, however, was properly viewed as either equitable or as a legal remedy incidental to an equitable cause of action[10] and accordingly not sufficient to create a right to jury trial. See Moore v. Sun Oil Co., 636 F.2d 154, 156-57 (6th Cir. 1980); Slack v. Havens, 522 F.2d at 1094 & n.4; Lynch v. Pan American World Airways, Inc., 475 F.2d 764, 765 (5th Cir. 1973); Robinson v. Lorillard Corp., 444 F.2d at 802. But see Setser v. Novack Investment Co., 638 F.2d 1137, 1142 (8th Cir. 1981).
 
 IV
 A. Female Class Prima Facie Case
 
 37
 Appellants' sex discrimination suit was predicated solely on Title VII. Cf. Runyon v. McCreary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (§ 1981 not applicable to gender discrimination). All claims were therefore tried to the court. Under the Act the standard for proving sex discrimination and race discrimination is the same. See White v. City of San Diego, 605 F.2d 455, 458-59 (9th Cir. 1979). Appellants sought to establish a prima facie case of sex discrimination by introducing evidence of statistical disparity and augmenting the statistics with documents and testimony.
 
 
 38
 Appellants' statistical studies indicated that although women comprised more than 30% of the Oakland plant work force, they were systematically excluded from many job categories. No women were employed as machine repairers, mold repairers or teamsters. Women were concentrated in three departments: janitorial, accounting and finished products. Women comprised only 4% of the officials and managers and 4% of the craft workers but were 48% of the operatives and 67% of the office and clerical workers. These statistics were demonstrably disproportionate when compared with the relevant labor market which Owens-Illinois had accepted for purposes of compliance with contracts of the Energy Research and Development Administration.[11] Women constituted 38% of the managers and professionals in the combined Oakland-Alameda County labor market and 40% of the Oakland work force which Owens-Illinois had agreed was its source for all other categories.
 
 
 39
 Of the new hires between 1971 and 1976, 37.2% were women. No women were hired, however, as "journeymen,"[12] teamsters or lehr attendants. Appellants also introduced evidence showing that as late as 1974 some departments were still designating by gender their requests for applicants and that particular individuals were denied promotions and harassed because of their sex.
 
 
 40
 Appellants offered two studies showing that women at the Oakland plant earned significantly less than men. Dr. Peele compared earnings between males and females. He found that male hourly employees, on the average, earned 63% more than women in 1973. This disparity was 61% in 1976. Dr. Drogin compared base salary rates for hourly employees and concluded that women earned approximately $2650 less per year.
 
 
 41
 Owens-Illinois' rebuttal of the sex discrimination claim closely paralleled its response to the race claims. It attacked the reliability of the statistical studies and introduced other studies to support its view. It also showed that most of the initial hiring was controlled by union hiring halls and that well over 80% of all promotions were subject to procedures in contracts between Owens-Illinois and particular unions. For reasons similar to those already explained in regard to the black class claims, we do not regard the evidence sufficient to rebut appellants' statistical case.
 
 
 42
 The company also challenged the non-statistical evidence. Although it acknowledged that women were generally not employed as lehr attendants, it presented evidence that it had encouraged women to apply for the position but that few women had chosen to do so. It further showed that during a reduction in work force, senior women selectors who could have remained on the job by exercising their labor agreement seniority rights to displace junior male lehr attendants, uniformly preferred unemployment.
 
 
 43
 The company conceded that at one time there were discriminatory placements. These placements may have accounted for an initial disparity between men and women, but the company argued that these practices were not actionable because they occurred prior to March 23, 1974, the cutoff date set by the trial court. Moreover, Owens-Illinois contended that although the initial placements may have been discriminatory, women had an equal opportunity for promotion under the applicable labor agreements.
 
 
 44
 The trial judge concluded that appellants failed to prove sex discrimination in earnings and non-supervisory and management promotions. The court did not state, however, whether plaintiff had proved a prima facie case of sex discrimination for anything more than supervisory and management promotions.
 
 
 45
 We have already held that the trial court erred in defining the relevant labor market, refusing to consider the continuing violations doctrine for promotions or placements occurring prior to the applicable limitations period, and in deeming non-discriminatory any action taken pursuant to a collective bargaining contract. Accordingly, we remand those parts of the women's class claims that relate to possible discrimination in: (1) hirings occurring within 300 days[13] prior to the filing of the first women's charge with the EEOC; (2) placements or promotions to non-professional and non-managerial positions occurring within the same period or earlier in the case of continuing violations; (3) promotions to professional and managerial positions occurring prior to the limitations period if they are continuing violations. Redetermination of the relevant market will permit assessment of appellants' prima facie case. If a prima facie case is established, adherence to collective bargaining agreements will not suffice as a rebuttal.
 
 B. Remedial Order:
 
 46
 The trial court's remedial order directs Owens-Illinois to (1) compile job descriptions for all supervisory and management positions at the Oakland plant; (2) permit all employees to complete a skill inventory form indicating their skills and areas of interest for promotion; (3) notify all female employees of current training programs for supervisory or management positions; (4) conspicuously post in one or more areas notices for each salaried supervisory, management and management trainee vacancy and include in the notice of vacancy the legend "Both female and male applicants encouraged" and (5) establish nondiscriminatory procedures for filling these vacancies. The company must (a) consider all applicants whose skills inventory forms show them to be qualified; (b) if there are no women applicants, solicit female applicants from qualified Oakland plant employees and/or from qualified females otherwise available; (c) choose the "best qualified" person according to a list of objective and subjective criteria;[14] (d) maintain records explaining why a participant was not selected for a particular position and (e) promptly notify in writing all applicants that the position has been filled and inform unsuccessful applicants upon request of the reason they were not selected.
 
 
 47
 The remedial order referred all claims for monetary relief to a United States Magistrate. The Magistrate was to provide back pay hearings for all women who claimed to have been discriminated against subsequent to March 23, 1974, in that they did not receive a supervisory or management position. The trial judge ruled that the Magistrate could not consider the merits of any claim which, at the relevant time of the violation, had an adequate remedy under a collective bargaining agreement.
 
 
 48
 Appellants contend that the remedial order is critically deficient in two aspects: (1) the order does not require Owens-Illinois to adopt any affirmative action guidelines; and (2) it severely restricts the number of women entitled to relief by disqualifying claimants who had a remedy under a collective bargaining agreement.
 
 1. Affirmative action
 
 49
 The primary objective of Title VII is prophylactic: to achieve equal employment opportunity and remove discriminatory barriers which have operated to favor white male employees over others. Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 429-30, 91 S.Ct. 849, 852-53, 28 L.Ed.2d 158 (1971). Towards this end, Congress has granted broad equitable powers to enable the courts to fashion the most complete relief possible. The district courts have " 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " Albemarle Paper Co. v. Moody, 422 U.S. at 418, 95 S.Ct. at 2371, quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965).
 
 
 50
 The particular remedy granted, however, is not limited to any specific or prescribed form; rather it is left largely to the broad discretion of the district court. Davis v. County of Los Angeles, 566 F.2d at 1342; Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622, 631 (2d Cir. 1974). We conclude that the trial court's remedial order was not an abuse of discretion.
 
 
 51
 Although the court's order does not give appellants everything they sought, it does eradicate the subjective criteria which permitted discriminatory promotions and it also places an affirmative duty on Owens-Illinois to seek women for its management and supervisory positions.
 
 
 52
 Firefighters Institute for Racial Equality v. City of St. Louis, 588 F.2d 235 (8th Cir. 1978), cert. denied, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979), cited by appellants to support its contention that the court of appeals should unilaterally order more affirmative measures such as preferential hiring or quotas, is distinguishable. In Firefighters, the Eighth Circuit concluded that the city was doing everything in its power to maintain its discriminatory policy and delay implementation of the trial court's decree. 588 F.2d at 240. The court of appeals therefore concluded that the only way to end this discrimination was by such affirmative measures. In this case, however, there has been no indication of non-compliance. It was not an abuse of discretion for the trial judge to conclude that preferential hiring or a quota system was unnecessary.
 
 2. Grievance proceedings
 
 53
 The district court also precluded any claims for back pay which were subject to grievance proceedings under any union contract. Appellants contend that this ruling improperly restricts class members' right to recover. We agree.
 
 
 54
 Title VII is silent on the need to exhaust contractual remedies or the effect of invoking union grievance procedures. Oubichon v. North American Rockwell Corp., 482 F.2d 569, 572 (9th Cir. 1973). Courts have stated, however, that Congress intended Title VII to be a separate and distinct mode of recovery. A Title VII plaintiff will therefore not be denied relief if he or she initiates a grievance proceeding prior to bringing a civil rights suit. Alexander v. Gardner-Denver Co., 415 U.S. 36, 59-60, 94 S.Ct. 1011, 1024-25, 39 L.Ed.2d 147 (1974); Oubichon, 482 F.2d at 572. This same policy argues strongly in favor of permitting a Title VII claimant to recover even if he or she failed to exhaust contractual remedies.
 
 
 55
 Owens-Illinois asserts that this issue is moot. Following the entry of the remedial order, Owens-Illinois circulated notices to women employed at the plant since March 23, 1974 advising them to file claims if they believed that they were discriminated against with respect to any promotion into any management or supervisory position including hourly supervisory positions covered by collective bargaining agreements. All resulting back pay claims were settled prior to the scheduled hearing before the Magistrate. The Magistrate therefore never determined whether any claim was subject to a union grievance procedure and therefore precluded by the court's remedial order.
 
 
 56
 While we agree that any claims which were settled are moot, we recognize that in further proceedings the trial court may discover additional women who are entitled to relief. Accordingly, we vacate that part of the remedial order which precludes claims which were subject to grievance procedures.
 
 V
 A. Discovery
 
 57
 The trial judge specified in his pretrial order that appellants could not discover Owens-Illinois computer tapes. He required the company to process whatever computer runs appellants requested but did not order Owens-Illinois to turn over physical possession of the tapes. The judge also allowed the possibility of further discovery if appellants could show good cause. Appellants contend that this order did not permit them adequate discovery and therefore resulted in a statistical case "prepared for them by (the) defendants." Appellants therefore request that on remand they be permitted to discover these tapes. We decline to impose such a limit on the trial court's discretion.
 
 
 58
 While it is true that computer tapes are not per se non-discoverable, Dunn v. Midwestern Indemnity, 88 F.R.D. 191, 194 (S.D. Ohio 1980); cf. Manual for Complex Litigation, 1 Pt. 2 J. Moore Federal Practice, Pt. 1 § 2.715 at 129 (2d Ed. 1980) ("(d)iscovery requests relating to the computer, its programs, inputs and outputs should be processed under methods consistent with the approach taken to discovery of other types of information"), the facts here do not compel the granting of appellants request. All information contained on the computer tapes was included in the wage cards which appellants discovered. R.T. 6645-59. Appellants were therefore not deprived of any data. While using the cards may be more time consuming, difficult and expensive, these reasons, of themselves, do not show that the trial judge abused his discretion in denying appellants the tapes.
 
 VI
 
 59
 Appellants have attacked the trial court's award of attorneys' fees to them as being too low. Because that award may have been based in part on the outcome of the case, our reversal requires that we also vacate the award. A new award will take into account the fact that appellants largely prevailed on appeal, and will of course reflect services rendered in further proceedings. The amount ultimately awarded by the district court should be explained and justified according to the factors set forth in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), cert. denied sub nom. Perkins v. Screen Extras Guild, Inc., 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). See also Sethy v. Alameda County Water District, 602 F.2d 894 (9th Cir. 1979), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980).
 
 VII
 To summarize:
 
 60
 The black class claims are remanded for further proceedings. It will there be necessary to redefine the relevant labor market for the purpose of determining the existence of disparate impact. Evidence of racial discrimination in placements and promotions occurring prior to the limitations period may be admitted for the purpose of determining the existence of violations supported by a policy with a continuing effect. Claims for any employment discrimination, discrete or continuing, occurring within 300 days before the initial charge filed with the EEOC or extending into that period will not be barred by limitations.
 
 
 61
 The prospective relief ordered by the district court for gender discrimination in promotion to supervisory or management positions is affirmed as modified. Remand is ordered, however, to permit women so discriminated against to establish back pay claims for discrimination occurring within 300 days before the initial charge to the EEOC, whether or not union grievance procedures were exhausted.
 
 
 62
 The remaining womens' class claims are remanded for further proceedings. As already indicated, the relevant market must be redefined. Evidence of gender discrimination in placement or promotion to non-managerial or non-supervisory positions antedating the limitations period may be admitted for the purpose of determining the existence of violations supported by a policy with a continuing effect. Claims for discrimination, discrete or continuing, occurring within 300 days of the initial charge to the EEOC or extending into that period are not barred by limitations. Failure to invoke grievance procedures will not defeat an otherwise viable claim.
 
 
 63
 With regard to both the black class and womens' class claims, the fact that discrimination, if established, was compelled by the provisions of a collective bargaining contract will not be a defense.
 
 
 64
 Affirmed in part, reversed in part and remanded.
 
 
 
 *
 The Honorable David Williams, United States District Judge, for the District of Central California, sitting by designation
 
 
 [1]
 One plaintiff's claims were dismissed prior to trial
 
 
 [2]
 Appellants also contend that the trial court erred in calculating the applicable statute of limitations. The court established the applicable period by subtracting 180 days from the date of the initial complaint filed with the EEOC. The court refused to apply the 300 day limit available in states which have a qualified compliance agency because there was no evidence that appellants had ever filed with the state. Appellants assert that filing with the state was not a prerequisite for extending the limitations period. We conclude that the trial court should have applied the 300 day limit
 42 U.S.C. § 2000e-5(c) provides that when there is a qualified state agency, a complaint must first be filed there. The statute also provides that the limitations period for filing with the EEOC is extended from 180 to 300 days when the aggrieved party has initiated a complaint with a qualified state agency. Id. § 2000e-5(e). The Supreme Court has held that the statute is satisfied when the Commission refers the complaint to the state agency on behalf of the person aggrieved. Love v. Pullman Co., 404 U.S. 522, 525, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972). Moreover, the EEOC has imposed upon itself the duty of making such a referral in every case where there is a qualified state agency. 29 C.F.R. § 1601.13 (1980) as revised by 46 Fed.Reg. 43,040 (1981). This court has held that a complainant is not charged with the failure of the EEOC to fulfill procedural requirements imposed upon it by statute. Watson v. Gulf & Western Industries, 650 F.2d 990, 992-93 (9th Cir. 1981). The same principle relieves the complainant from the consequences of a failure of the EEOC to follow the procedures it has imposed upon itself. Cf. Ramirez v. National Distillers & Chemical Corp., 586 F.2d 1315, 1320 (9th Cir. 1978). Filing a complaint with the EEOC placed the Commission under a duty to refer the complaint to the California compliance agency. The complainant is not to be prejudiced by the EEOC's failure to fulfill its duty. Roberts v. Arizona Board of Regents, 661 F.2d 796, 799 (9th Cir. 1981). This conclusion does not automatically invoke the 300 day limit, however. The statute further provides that no charge may be filed with the EEOC until the expiration of 60 days after proceedings have been commenced with the state agency. 42 U.S.C. § 2000e-5(c). The Supreme Court held in Mohasco Corp. v. Silver, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), that the effect of this provision is to render untimely any charge originally filed with the EEOC more than 240 days after the act complained of, unless the state agency actually disposes of the referred charge before a total of 300 days has elapsed. Id. at 814 n.16.
 This court has ruled, however, that the Mohasco rule is not to be applied retroactively, and that the 300 day limit applies to charges filed with the EEOC in deferral states on or before June 23, 1980. Wiltshire v. Standard Oil Co. of California, 652 F.2d 837, 842 (9th Cir. 1981). Charges in the present case are therefore subject to the 300 day limit.
 
 
 [3]
 We emphasize that a continuing violation exists only if Owens-Illinois' promotion policy was discriminatory and continued in effect into the permissible limitations period. A continuing violation should be distinguished from the continuing impact of a past, yet discrete and no longer existent discriminatory act. The fact that some employees were harmed by the continuing impact of Owens-Illinois' discrete incidents of prior discrimination that occurred before the limitations period is not sufficient. Compare United Air Lines Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (continuing impact of past violation not actionable) with Reed v. Lockheed Aircraft Corp., 613 F.2d at 760 (mere continuing impact must be distinguished from continuing violations; continuing violations are actionable, continuing impact from a past violation is not)
 
 
 [4]
 Appellants introduced two statistical studies which classified employees by race. These studies indicated that few blacks were employed as managers or craftsmen and that the majority of blacks worked as service workers (janitors and matrons) and laborers. The district court properly discounted these studies because they failed to exclude employees hired prior to July 2, 1965, the effective date of Title VII for private employers. The Supreme Court has stated that an employer who after the effective date of the Act makes all employment decisions in a non-discriminatory manner "would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." Hazelwood School District v. United States, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977) (footnote omitted). "To include pre-Act hires in the statistical analysis in this case would improperly weight the evidence and would tend to show present discrimination by an employer if it had discriminated prior to the effective date of the Act but had not discriminated after the Act took effect." EEOC v. United Virginia Bank, 615 F.2d 147, 150 (4th Cir. 1980); see Movement for Opportunity and Equality v. General Motors, Corp., 622 F.2d 1235, 1245 (7th Cir. 1980)
 Appellants also introduced studies showing statistical disparity in terminations. This study indicated that 20% of white employees who left the Oakland plant were fired while the corresponding figure for blacks was 48%. The district court properly concluded that this study was also invalid. On cross-examination, one of appellants statistical experts conceded that although he developed the study, he did not know what Owens-Illinois classified as "termination for cause."
 We express no opinion as to appellants' two wage and pay studies. Appellants' statistics indicated that black workers earned significantly less than white workers. Owens-Illinois asserted that appellants' studies were methodologically unsound. In addition, the company claimed that all wage rates were set pursuant to the provisions of collective bargaining agreements.
 Under questioning by the court, appellants' counsel admitted that there were no wage discrepancies between whites and blacks or men and women that were not the result of union contracts. Reporter's Transcript, Vol. XXXV, at 4477-78. As is discussed more fully in the text, infra, the trial court incorrectly ruled that any action undertaken pursuant to a collective bargaining agreement was non-discriminatory. The court therefore discredited the wage studies as a natural consequence of its ruling regarding the collective bargaining agreements.
 
 
 [5]
 Appellants' failure to assert a cause of action against the union does not provide a defense to the employer. Whether Owens-Illinois has fulfilled its responsibility to protect the Title VII rights of its current and prospective employees is determined in terms of its own actions, not in relation to the actions of others. See Grant v. Bethlehem Steel Corp., 635 F.2d at 1014; Rosen v. Public Service Electric & Gas Co., 477 F.2d 90, 95 (3rd Cir. 1973). Nor do we understand appellants to have conceded that actions taken pursuant to union contracts were non-discriminatory. The appellants merely asserted that they had not sued the unions because the unions were willing voluntarily to change any practices found to violate Title VII. Reporter's Transcript of Pretrial Conference, 16-19 (June 16, 1978)
 
 
 [6]
 The trial judge did not indicate whether his ultimate conclusion that Owens-Illinois did not discriminate was predicated on appellants' failure to prove a prima facie case by showing that the company's actual hiring was statistically disparate, or whether he found that Owens-Illinois successfully rebutted appellants' prima facie case. In any event, we have concluded that the establishment of a prima facie case can only be determined upon remand when the relevant market is properly established. We have also concluded that upon the present record, appellants' statistical case has not been rebutted
 
 
 [7]
 See note 6 supra
 
 
 [8]
 In 1973, Owens-Illinois was considered for a government contract by the United States Energy Research and Development Administration (ERDA). Prior to awarding the contract, ERDA examined the composition of the Oakland plant to determine whether the company was in compliance with the affirmative action goals of Executive Orders 11246 and 11375. Owens-Illinois considered the labor pool for all non-managerial and professional jobs to be the labor force for the city of Oakland. ERDA accepted Oakland as the relevant market, but considered the population a more accurate reflection of the percentage of blacks available
 
 
 [9]
 The trial court's pretrial order is ambiguous on this point. It states: "The trial will be to a jury, which will consider questions of both liability and remedy. The trial will not be bifurcated. The jury verdict will be advisory as to all matters the jury considers, except the matters of: (a) whether defendant was guilty of such racial discrimination as to make it liable for § 1981 compensatory and punitive damages; (b) the amount if any, of such compensatory and punitive damages." Excerpt of Record at 72
 The reporter's transcript for the session which discussed whether the class claims would be tried to the jury is similarly unclear, although subsequent references indicate that the district judge felt that he had disallowed all class claims for legal relief. See Reporter's Transcript, 5-8 (Oct. 10, 1978); Vol. XXXV, at 4472-75.
 
 
 [10]
 Even if the back pay remedy is legal in nature, appellants were nevertheless not entitled to a jury trial, because it is here incidental to equitable claims. Beacon Theater, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and Dairy Queen Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) preserved the right to jury trial where there was a joinder of both legal and equitable causes of action, not in a situation where a single cause of action must be characterized as either legal or equitable. See Slack v. Havens, 522 F.2d 1091, 1094 n.4 (9th Cir. 1975)
 
 
 [11]
 But see text & note 8 supra
 
 
 [12]
 The Oakland plant has approximately 350 different job classifications. There is no "journeyman" class. This terms was created by appellants' counsel who combined numerous skilled positions to create this category. Owens-Illinois attacked this category as an arbitrarily contrived, meaningless amalgam. See Reporter's Transcript, Vol. XXXIII, at 4076-81. The absence of female hires in the component categories is not, however, without probative force
 
 
 [13]
 See note 2 supra
 
 
 [14]
 Owens-Illinois must consider, among other factors, the applicant's job qualifications, disciplinary record, attendance and medical record, length of service (although seniority is not required to be a controlling factor), experience, education, prior training, job performance ratings, interest in the position and any other factor unique to the vacancy. Naturally, the district court's list is not exclusive. We therefore highlight one factor which the trial judge did not include but which Owens-Illinois should consider in determining which applicant is "best qualified"-the benefit from and desirability of having an integrated and diverse work force. Cf. Regents of University of California v. Bakke, 438 U.S. 265, 311-14, 98 S.Ct. 2733, 2759-60, 57 L.Ed.2d 750 (1978)