**Ronald E. WHITE, Plaintiff,**

v.

**STACKHOUSE, INC., Defendant.**

### Civ. A. No. 94–0090–L.

United States District Court, W.D. Virginia, Lynchburg Division.

Dec. 20, 1995.

Gary M. Coates, Fralin, Feinman, Coates & Kinnier, P.C., Lynchburg, VA, for plaintiff.

James Gorman Rosenberger, Jr., Wilson, Garbee & Rosenberger, Lynchburg, VA, Kurt N. Peterson, C.R. Wright, Fisher & Phillips, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

KISER, Chief Judge.

White alleges that, by not rehiring him, Stackhouse discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, ("ADA"). On either April 22, 1994 or May 6, 1994, White filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On October 29, 1994, the EEOC issued him a right to sue letter. White filed this action on November 10, 1994. I now consider the defendant's summary judgment motion. The parties have fully briefed and argued the motion, and the motion is ready for disposition.

## I. Facts

Stackhouse, Inc. is a utility construction and maintenance company which contracts with electric power companies to install and maintain electric utility lines. Ronald White worked on and off for Stackhouse between 1973 and 1990. In July 1987, White suffered a work-related back injury, and, in December 1987, he quit working at Stackhouse due to this alleged injury.

White underwent back surgery in December 1987 and again in January 1989. White filed a worker's compensation claim against Stackhouse in connection with his back injury and began receiving benefits. In July 1990, White returned to work at Stackhouse on light duty status. White's pain escalated, and White stopped showing up for work after September 6, 1990. After White stopped working, he and Stackhouse agreed to settle his worker's compensation claim and to terminate the benefits that he had been receiving. On October 22, 1990 Stackhouse settled for a lump sum payment of $42,500.

In December 1990, White called Ben Ward, then Corporate Secretary for Stackhouse, and indicated that he was ready to return to work. Ward brought this phone call to the attention of James Edmondson, the President of Stackhouse. Edmondson contends that he told Ward not to hire White because White had cheated Stackhouse. White contends that Ward told him, "I would like to hire you but I can't because our lawyers said you would be too big a risk to our insurance." This was Stackhouse's initial refusal to rehire White. In a note added to White's employment file, Ward wrote: "Do Not Rehire—BAW 12/10/90." In January, 1991, White wrote Edmondson requesting a

job. In a follow-up letter, White told Edmondson that Ward had told White that he could not rehire him because he was "too big a risk." In a February 22, 1991 letter, Edmondson advised White that Stackhouse would not rehire him.

Beginning in 1991, James DeBord and Bill Conner were the Stackhouse personnel with authority to hire in Lynchburg. At some point after talking to White, Ward told De-Bord not to rehire White. In May 1991, DeBord told Conner not to rehire White. The defendant alleges that DeBord followed Ward's directive only until September 1991, when Ward died. Since Ward's death, De-Bord purportedly refused to hire White because he thought White was dishonest. Allegedly White made comments to DeBord that indicated that White was dishonestly milking Stackhouse for money through his worker's compensation claim and settlement. For example, allegedly White told DeBord that Stackhouse bought him a new car and that he was making more money sitting at home than he made working.

Thus, DeBord claims that he did not consider White's impairment in refusing to hire him. White does not dispute this specific claim but instead builds a theory that Ward created a standing order based on discriminatory intent. Ward's statement regarding White being an insurance risk allegedly evidences the discriminatory intent. In his Memorandum in Opposition to defendant's summary judgment motion, White stated that Ward's order not to rehire White was never reconsidered and remains in effect. *See* Memorandum in Opposition at 20–21.

On July 26, 1992, the ADA became effective. On July 29, 1992, White allegedly came to the Lynchburg office of Stackhouse, showed DeBord a newspaper article about the ADA, filled out and submitted an employment application and said that the ADA would now require Stackhouse to rehire him. A few lines above White's signature on that application, a clause states, "This application will be retained for active consideration no longer than sixty (60) days from the date submitted." Since that application, White submitted numerous job applications to Stackhouse. White applied in November 1993 and applied again as recently as January 1995. Stackhouse has not rehired White.

## II. Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

## III. Analysis

White claims that the alleged discrimination involved constitutes a serial continuing violation and that the earliest refusal to rehire does not trigger the statute of limitations in light of the refusal to rehire based on his November 1993 application. Although the continuing violation doctrine is not well defined, in examining the case law and the policies behind the doctrine, I am confident that it should not apply to the situation at hand. Consequently, the cause of action is time-barred by the statute of limitations. *See* 42 U.S.C. § 2000e–5(e) (stating that a charge shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred).

The Supreme Court has tried to clear up the murky waters of the continuing violation doctrine on several occasions. *See, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Lorance v. AT & T Technologies,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). However, the doctrine remains fairly unclear. In *Lorance,* the Court considered whether an action was time-barred that was brought by employees who challenged an allegedly discriminatory seniority system. More specifically, the issue was whether the limitations period ran from the time of the change in the system or from the time of the allegedly disparate impact on the employees. If the former, the action was time-barred; if the latter, it was not. The plaintiffs had not alleged that the seniority system was operat-

ed in an intentionally discriminatory manner but that its discriminatory impact had its genesis in discrimination. *Id.* at 905, 109 S.Ct. at 2265 (citation omitted).

The Court affirmed the Seventh Circuit's ruling that the claim was time-barred because " 'the relevant discriminatory act that triggers the period of limitations occurs at the time an employee becomes subject to a facially neutral but discriminatory seniority system that the employee knows, or reasonably should know, is discriminatory.' " *Id.* at 903, 109 S.Ct. at 2264 (quoting *Lorance v. AT & T Technologies, Inc.,* 827 F.2d 163, 167 (7th Cir.1987)). In considering whether a continuing violation existed, the Court stated, " '[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful.' " *Id.* at 907, 109 S.Ct. at 2266 (quoting *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (emphasis in original)). The Court rejected the continuing violation theory, concluding that the plaintiffs had "asserted a claim that [was] wholly dependent on discriminatory conduct occurring well outside the period of limitations." *Id.,* 490 U.S. at 908, 109 S.Ct. at 2267.

■ Likewise in the instant case, the plaintiff's theory is that the continued rejection of White's application was the result of Ward's 1990 standing order which emanated from discriminatory intent. The limitations period runs from the point of the discriminatory act and not from the later continuing effects. White did not allege any facts that point to continuing discriminatory intent. In his complaint, White did allege that Stackhouse continually refused to reinstate White due to discrimination. Complaint at ¶ 8. However, in the complaint, the only factual allegation supporting discrimination was White's claim that Ward told him, "I would like to hire you but I can't because our lawyers said you would be too big a risk to our insurance." Id. at ¶ 6. In his Memorandum in Opposition to defendant's summary judgment motion, White clarified his theory of discrimination—that the initial 1990 decision not to hire White was a standing order

that was based on discriminatory intent. White stated that

> the evidence establishes that once the decision not to rehire White was made, it was never reconsidered. Ward wrote "Do Not Rehire" in White's employment file. Ward told James DeBord, Stackhouse's Roanoke/Lynchburg District Supervisor, not to rehire White sometime between December, 1990 and May, 1991.... Ward's 1990 order not to rehire White continues to the present time ...

Memorandum in Opposition at 20–21.

White claims that this case is similar to *Satz v. ITT Financial Corp.,* 619 F.2d 738 (8th Cir.1980), an employment discrimination case in which the plaintiff alleged discriminatory denial of equal pay, discriminatory denial of equal training and discriminatory denial of promotion or advancement. *Id.* at 741. The alleged denial of promotion occurred prior to 180 days before the plaintiff filed a charge with the EEOC, and the district court dismissed the claim for lack of subject matter jurisdiction. *Id.* at 742. The court of appeals reversed, stating that the district court did not address the full substance of the plaintiff's complaint. For example, the plaintiff had also complained that the defendant had reassigned duties away from her in a discriminatory manner within the 180 days. *Id.* at 743. The situation at hand differs from *Satz* in that, when pruned down, White's theory of discrimination is based on one act of discrimination, and this act is time-barred. *Satz* involved several alleged acts of discrimination, some of which were not time-barred, and all of which were separate acts initiated by the employer. Here, White seeks to rely on repeated refusals of his job applications that he repeatedly renewed.

The present case is similar to the termination/refusal-to-rehire cases. For example, in *DeFazio v. Delta Air Lines, Inc.,* 849 F.Supp. 98 (D.Mass.1994), the court considered an allegedly discriminatory termination followed by a refusal-to-rehire. The court stated,

> [A] prior act of alleged discrimination cannot be transformed into a continuing violation by the mere fact of a refusal to rehire.... In this case, if it were held that

a failure to rehire constituted a continuing violation, the six month filing requirement would be entirely eviscerated. In every termination of employment case, the claimant could reapply and effectively extend the time for the filing ...

*Id.* at 102. In *Burnam v. Amoco Container Co.*, 755 F.2d 893, 894 (11th Cir.1985), the court stated that "a failure to rehire subsequent to an allegedly discriminatory firing, absent a new and discrete act of discrimination in the refusal to rehire itself, cannot resurrect the old discriminatory act." *Id.* (citing *Collins v. United Air Lines, Inc.*, 514 F.2d 594, 596 (9th Cir.1975)). "Otherwise, a potential plaintiff could always circumvent the limitations by reapplying for employment. A simple request for reinstatement 'seeks to redress the original termination.'" *Id.* (quoting *Collins* at 596).

Although the instant case is not a termination/refusal-to-rehire case, the situation is similar. Ward's statement, combined with the initial refusal to rehire, are the only real pieces of evidence of discrimination. Thus, the only evidence of discriminatory intent occurred before the effective date of the ADA and far enough before the statute of limitations to bar the cause of action. If the plaintiff's repeated applications revived the cause of action, then the statute of limitations would be eviscerated.

In arguing against the above comparison between termination/refusal-to-rehire cases and the case at hand, plaintiff could point out that courts have generally distinguished the facts of the instant case from the termination/refusal-to-rehire cases. For example, one court stated as follows:

A discharged employee who seeks to be *reinstated* is really litigating the unfairness of his original discharge because only if the original discharge was discriminatory is he entitled to be reinstated as if he had never ceased working for the employer. The word *reinstatement* must be employed in this connection as the equivalent of uninterrupted employment.... The concept of a discriminatory refusal to hire is a different concept. If a person—whether a former employee or not—applies for employment and discriminatorily is refused

employment ..., the employer has committed a separate and distinct unfair ... practice."

*NLRB v. Textile Machine Works*, 214 F.2d 929, 932 (3d Cir.1954) (emphasis in original). However, this statement assumes that the discriminatory refusal-to-hire situation is an act of discrimination accompanied by separate discriminatory intent proximately conjoined with that refusal to hire. The policy behind the termination/refusal-to-rehire situations applies to the case at hand as the facts of the two situations are similar in a relevant way. In both situations, one clear alleged act of discrimination exists and the following acts are only consequences of the discrimination. In the case at hand, the plaintiff's theory is not that the refusals to rehire subsequent to the initial one were based on discriminatory intent; instead, they were allegedly based on a standing order that was based on discriminatory intent.

The continuing violation doctrine is more appropriate when evidence of discrimination is subtle and ongoing than when it is distinct and based mainly on one identifiable event. One court stated,

[A]t least one member of the panel doubts whether the "continuing violation" theory should operate to allow recovery with respect to a distinct act of discrimination taking place at an identifiable point of time outside the limitations period. It may be that the continuing violation theory is more appropriately limited to a situation where there is no single act of discrimination sufficient to trigger the running of the limitations period.

*Cajigas v. Banco de Ponce*, 741 F.2d 464, 470 (1st Cir.1984) (citation omitted). This is related to my opinion that the plaintiff's notice of discrimination is relevant in determining whether a continuing violation existed. Often, if the exact time of discrimination is difficult to pinpoint, then courts trigger the limitations period when the plaintiff knew or should have known of the discrimination. *See, e.g., Hamilton v. 1st Source Bank*, 895 F.2d 159 (4th Cir.1990) (citation omitted); *Stewart v. CPC Intern, Inc.*, 679 F.2d 117, 120 (7th Cir.1982) (citations omitted). But when White applied for the job on July 29, 1992, three days after the ADA went into

effect, allegedly a violation of the act occurred. According to White's theory of the case, the continuing discriminatory intent was in place and by refusing to hire him pursuant to his July 29, 1992 application, the ADA was violated thus giving rise to his cause of action. Under White's theory and evidence, this would have triggered the running of the 180 day statute of limitations. Nothing occurred subsequent to the July 29, 1992 application except White continued to apply for a job and Stackhouse continued to turn him down.

 Additionally, courts have held that the policies are very different when a claimant alleges on the job discrimination as an employee as compared to when a non-employee alleges discrimination. *See, e.g., Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982). In *Williams,* the court defined the continuing violation doctrine to mean that "a systematic policy of discrimination is actionable even if some *or all* of the events evidencing its inception occurred prior to the limitations period." *Id.* (emphasis added). However, the court proceeded to state that such violations are most likely to occur in the matter of placements or promotions. *Id.* The court stated that challenges to systemic discrimination are always timely filed if brought by present employees. However,

> [t]he situation may be different … with regard to complainants who have ceased to be employees or never were employees. A refusal to hire or a decision to fire an employee may place the victim out of reach of any further effect of company policy, so that such a complainant must file a charge within the requisite time period after the refusal to hire or termination, or be time-barred. If in those cases the victims can show no way in which the company policy had an impact on them within the limitations period, the continuing violation doctrine is of no assistance or applicability, because mere "continuing *impact* from past violations is not actionable. Continuing violations are."

*Id.* (citations omitted) (emphasis in original).

IV. Conclusion

 In my opinion, this is not a continuing violation because Ward's standing order was the only allegedly discriminatory act; the following refusals were only effects of this standing order. The latest point at which the cause of action could possibly have accrued was sixty days after White's July 29, 1992 application. At this point White had all the evidence of discrimination that exists. White would have had a total of approximately eight months (two months during which his application remained on active consideration plus the six month statute. of limitations) to sue after this application. However, he failed to bring suit in a timely fashion. Carried to the extreme, if White could re-trigger the statute of limitations upon each job application, then he would be able to delay the running of the statute of limitations *ad infinitum.*

For the foregoing reasons, I grant the defendant's motion for summary judgment. An appropriate order shall enter.