260 F.3d 1009 (9th Cir. 2001)
 MONICA KNOX, PLAINTIFF-APPELLANT,
v.
GRAY DAVIS,* GOVERNOR OF CALIFORNIA, DEFENDANT. AND T. A. TERHUNE, DIRECTOR OF CDC; DAVID TRISTAN, DEPUTY DIRECTOR, DEPARTMENT OF CORRECTIONS; ERNEST E. ROE, WARDEN, CALIFORNIA STATE PRISON, LANCASTER; MIKE PITOCCO, LITIGATION COORDINATOR AT CSP-LAC, DEFENDANTS-APPELLEES.
 No. 98-55871
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 17, 2001
Filed August 8, 2001
 
 Counsel Monica Knox, Esq., La Crescenta, California, in pro per.
 Elizabeth S. Angres, Dag, Los Angeles, California, for appellees.
 Appeal from the United States District Court for the Central District of California Dickran M. Tevrizian, District Judge, Presiding D.C. No. CV-97-05354-DT
 Before: Melvin Brunetti and A. Wallace Tashima, Circuit Judges, and William W Schwarzer,** District Judge.
 Opinion by Judge Brunetti; Dissent by Judge Schwarzer
 BRUNETTI, Circuit Judge:
 
 
 1
 Monica Knox ("Knox") appeals from the district court's dismissal of her §§ 1983 action on the basis that her claim was not brought within the applicable one-year limitation period. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and we affirm.
 
 I. Facts
 
 2
 Knox is an attorney who is licensed to practice law in the state of California. She has been a criminal defense attorney for over nineteen years and works in the Office of the Federal Public Defender for the Central District of California.
 
 
 3
 Knox began representing William Packer ("Packer"), an inmate in a California Department of Corrections ("CDC") facility, in January 1993. In July 1995, Knox married Packer, and since then has continued to serve as Packer's public defense attorney. Throughout the course of their professional and personal relationships, Knox and Packer have exchanged both confidential and general correspondence through the CDC prison system. In addition, Knox visited Packer in prison both as a general visitor and as a legal visitor on numerous occasions.
 
 
 4
 After Packer was placed in Administrative Segregation in CSP-LAC (the prison facility where Packer is housed), Knox made several unsuccessful attempts to visit Packer. On November 18, 1994, Knox received a letter from Warden Roe indicating that her visitation privileges were suspended "pending the completion of an investigation concerning violations of the attorney/client privilege." The suspension applied to both Knox's personal and legal visitation privileges and was premised upon the fact that a "preliminary investigation reveal[ed] that [Knox's] conduct and relationship with Inmate Packer deems [Knox] a risk to the safety and security of th[e] [CDC] institution." Knox was not permitted to visit Packer from November 18, 1994 through January 19, 1995. Meanwhile, Knox's personal attorney made repeated attempts with prison officials to ascertain the reason for Knox's suspension, but none of the correspondence was answered by the prison.
 
 
 5
 On November 22, 1994, Warden Roe sent a letter to Maria Stratton ("Stratton"), Knox's superior in the Federal Public Defender's office, advising her of Knox's suspension and the reasons underlying the suspension (i.e. violations of the attorney/client privilege, "unethical conduct, " and the risk posed by Knox "to the safety and security of[the] institution"). On December 22, 1994, Stratton spoke with Mike Pitocco ("Pitocco"), the Litigation Coordinator at CSP-LAC, who stated that the only reason for Knox's suspension was "the alleged misuse of legal mail or visitation for personal issues." Pitocco denied the allegation that Knox's suspension was due to any concern about potential security breaches or the passing of any inappropriate items. On December 5, 1995, Knox's personal attorney attempted to telephone Pitocco concerning the suspension, but Pitocco refused to discuss the matter.
 
 
 6
 Warden Roe sent a letter to Knox's personal attorney on January 18, 1995, reinstating Knox's regular visitation privileges. The letter also indicated, however, that Knox's legal visitation rights would not be reinstated because the investigation was undergoing administrative review. Warden Roe sent another letter to Knox's personal attorney on March 24, 1995, advising him that Knox's suspension would extend to legal mail and that no further legal mail between Packer and Knox would be processed by the prison. In accordance with Warden Roe's letter, CSP-LAC's staff stopped processing all of Packer's legal mail to or from Knox. On September 26, 1995, Warden Roe sent a letter to Knox's personal attorney stating that Knox's attorney rights, both her visiting and mail privileges, were "permanently suspended."After receiving Warden Roe's letters setting forth the terms of Knox's suspension, Knox and her attorney began communicating with the CDC Institutions Division. On November 21, 1995, Knox spoke with an assistant from the Southern Regional Administrator's Office in the CDC Institutions Division, who advised Knox that it is was problematic for her to serve as both Packer's spouse and attorney. In response to a letter written by Knox, David Tristan ("Tristan"), the Deputy Director of the Institutions Division of the CDC, wrote a letter to Knox on January 20, 1996, stating that an internal investigation had revealed that Knox had misrepresented the type of mail she was sending to Packer. The letter also specifically stated that observations by CDC staff and her "indisputable personal relationship with Packer" led to the conclusion that Knox posed "a significant threat to the safe and secure operations of CDC facilities." Tristan's letter revoked all of Knox's legal mail and visitation rights at all CDC institutions and with all CDC inmates. Although Knox alleges that she was denied notice and a hearing several times, she provides no dates for these denials in her complaint in this action.
 
 
 7
 Knox's suspension was modified on July 30, 1996, allowing her limited and restricted attorney-client visitation and mail rights as an assistant public defender with Darnell Lucky ("Lucky"), Knox's client on death row. The ban, as modified with regards to Lucky, continues and has not been revoked or modified by the CDC in any way after July 30, 1996. Since then, there have been several instances in which the CDC, in reliance on the suspension, has denied Knox either legal visitation or correspondence privileges with CDC inmates.[1] Each referenced CDC action occurred within one year of the filing of Knox's civil complaint, which Knox brought in the Central District of California on July 21, 1997. The district court provided Knox with two opportunities to amend the complaint[2] before finally dismissing her claims on April 6, 1998. Knox timely appeals.
 
 II. Standard of Review
 
 8
 We review de novo the district court's decision to dismiss a §§ 1983 action for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Morales v. City of Los Angeles, 214 F.3d 1151, 1153 (9th Cir. 2000). All factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of the non-moving party. Tworivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).
 
 III. Statute of Limitations
 
 9
 Actions brought pursuant to 42 U.S.C. §§ 1983 are governed by the forum state's statute of limitations for personal injury actions. See Wilson v. Garcia, 471 U.S. 261,276 (1985). In California, the statute of limitations is one year. See Fink v. Shedler, 192 F.3d 911, 914 (9th Cir. 1999); Cal. Civ. Proc. Code §§ 340(3) (West Supp. 1999). "Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues." Morales, 214 F.3d at 1153-54. Under federal law, "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Tworivers, 174 F.3d at 992.
 
 
 10
 Knox concedes that her §§ 1983 claim accrued on January 20, 1996. On that date, she received a letter from Tristan, the Deputy Director of the Institutions Division of the CDC, formally withdrawing her legal mail and visitation privileges at all CDC facilities and with all CDC inmates. Knox did not file her §§ 1983 lawsuit challenging the suspension until July 21, 1997, more than one year after receiving Tristan's suspension letter. Thus, Knox's claim is time-barred unless she has pled a continuing violation of her rights.
 
 
 11
 Knox argues that each time she is denied access to one of her clients housed in a CDC facility, a new cause of action arises under the continuing violation theory. The continuing violation theory applies to §§ 1983 actions, see Gutowsky v. City of Placer, 108 F.3d 256, 259 (9th Cir. 1997), allowing a plaintiff to seek relief for events outside of the limitations period. See Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir. 1982). Since Knox does not allege a system or practice of discrimination, the only way she can hope to show a continuing violation is to "state facts sufficient . . . [to] support[ ] a determination that the alleged discriminatory acts are related closely enough to constitute a continuing violation, and that one or more of the acts falls within the limitations period." DeGrassi v. City of Glendora, 207 F.3d 636, 645 (9th Cir. 2000).
 
 
 12
 However, this court has repeatedly held that a "mere `continuing impact from past violations is not actionable.' " Grimes v. City and County of San Francisco, 951 F.2d 236, 238-39 (9th Cir. 1991); Williams, 665 F.2d at 924 (quoting Reed v. Lockheed Aircraft Corp., 613 F.2d 757, 760 (9th Cir. 1980)); Abramson v. University of Hawaii, 594 F.2d 202, 209 (9th Cir. 1979) ("The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful."). Knox's cause of action accrued when she received Tristan's permanent and complete suspension letter on January 20, 1996. The continuing violation doctrine is inapplicable because Knox has failed to establish that a new violation occurs each time she is denied her visitation or mail privileges. Rather, the CDC's subsequent and repeated denials of Knox's privileges with her clients is merely the continuing effect of the original suspension.
 
 
 13
 This result is compelled by the Supreme Court's decision in Delaware State College v. Ricks, 449 U.S. 250 (1980). In Ricks, the plaintiff alleged that his employer, a college, violated Title VII when it denied him tenure and terminated his employment on the basis of his race. See id. at 254. Specifically, Ricks argued that his eventual termination, a year after he was denied tenure, was part of a continuing violation that began with the college's decision to deny him tenure. See id. Under the college's policy, junior faculty who are denied tenure are offered a "terminal" contract to teach one additional year. When that contract expires, so too does the employment relationship. The Court recognized that the statute of limitations commenced when Ricks was notified that he would not receive tenure, and then stated, "[i]t is simply insufficient for Ricks to allege that his termination `gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.' " See id. at 252-53.
 
 
 14
 In discussing Ricks, this court stated that"Ricks, on learning of the denial of tenure, would have notice of all allegedly wrongful acts that he later sought to challenge,[and] the statute of limitations must be deemed to commence at that time." Hoesterey v. City of Cathedral City, 945 F.2d 317, 319 (9th Cir. 1991). We noted that "the termination of Ricks' employment was not an independent discriminatory act, but merely the `delayed, but inevitable, consequence of the denial of tenure.' " Id.; see also London v. Coopers & Lybrand, 644 F.2d 811, 816 (9th Cir. 1981) ("Absent special circumstances, a single act by an employer adverse to an employee's interests, such as a discharge, layoff, or failure to transfer or promote, begins the running of the statute of limitations and the natural effects of the allegedly discriminatory act are not regarded as `continuing.' "). Likewise, Knox had notice of all the wrongful acts she wished to challenge at the time of the suspension letter because the letter informed her that she was permanently denied all visitation or mail privileges. See, e.g. Chardon v. Fernandez, 454 U.S. 6 (1981) (holding that a wrongful termination claim accrued at the time the plaintiff received notice of the termination, not at the time of the termination itself); see also Doe v. Donnelly & Sons Co., 42 F.3d 439, 445 (7th Cir. 1994) ("[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred."). It was apparent to Knox, and she concedes, that the notice of total and permanent suspension on January 20, 1996 started the running of the statute of limitations. Subsequent denials to requests to visit or correspond with inmates at CDC facilities, where the basis for the denials rests on the letter of permanent suspension, are nothing more than the delayed, but inevitable, consequence of the total and permanent suspension decision.[3]
 
 
 15
 At oral argument, Knox likened her situation to being punched in the nose, arguing that the January 20, 1996 permanent suspension letter acted as the first punch and each subsequent denial of access to clients housed in CDC facilities acted as additional punches. She contends that each punch serves as an independent violation of her civil rights, thereby triggering a new running of the statute of limitations from the point at which she was last punched. We reject this analogy. There is no doubt that the permanent suspension letter served as the symbolic punch in the nose, triggering the statute of limitations. However, each subsequent denial to requests for access to clients at CDC facilities was based upon the letter of permanent suspension, not on an independent consideration. In fact, in the complaint itself, Knox explicitly alleges that each visitation or correspondence denial was based upon the permanent suspension decision.[4] Thus, rather than being punched several times, Knox's subsequent denials are more akin to developing problems as a natural consequence of the one and only punch, such as a bloody nose. The subsequent denials were nothing more than a continuing impact of the permanent suspension, not new violations in and of themselves.
 
 
 16
 Interestingly, although there is sufficient Ninth Circuit and Supreme Court authority to guide this court, Knox relies wholly on out-of-circuit cases to support her theory that "every time [she] is precluded from communicating with a client, a new wrongful act, new injury and a new cause of action accrue." These cases do not persuade us to depart from this circuit's continuing violation jurisprudence. For instance, although Knight v. Columbus, Georgia, 19 F.3d 579 (11th Cir. 1994), tends to support Knox's theory, it directly conflicts with our decision in Pisciotta v. Teledyne Indus., 91 F.3d 1326 (9th Cir. 1996).[5] The other cases are similarly distinguishable.
 
 
 17
 Lastly, Knox argues that the favorable modification of the ban on July 30, 1996, allowing her limited and restricted attorney-client visitation and mail rights with Darnell Lucky, created a new accrual date bringing her suit within the statute of limitations period. This argument, too, lacks merit. Her reliance on Mir v. Little Co. of Mary Hospital , 844 F.2d 646 (9th Cir. 1988), is misplaced as Mir stems from the special rule applied in antitrust cases that "[a] cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant." Id. at 648. There is no corresponding rule or authority for §§ 1983 actions.
 
 IV. Procedural Due Process
 
 18
 Knox also argues that the CDC violated her procedural due process rights by denying her notice of the basis for the suspension and a hearing. Hoesterey held that a procedural due process claim accrues when a plaintiff is given final notice that she would not receive further process. See Hoesterey, 945 F.2d at 320. Knox alleges in her complaint that she made several requests for a hearing and that the CDC denied these requests. Hoesterey supports the district court's dismissal because Knox's complaint indicates that she received notice that no further process would be forthcoming. Thus, even assuming that the allegations in Knox's complaint are true, her claim is time-barred because at the latest, the statute of limitations commenced at the time she received notice that she would not receive any further process. It appears from a plain reading of the complaint that these denials came prior to the final suspension letter from Tristan.
 
 V. Conclusion
 
 19
 Since Knox has failed to plead facts showing a continuing violation, her §§ 1983 claim is time-barred by the statute of limitations.
 
 
 20
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Gray Davis, Governor of the State of California in place of Pete Wilson, former Governor of the State of California.
 
 
 **
 Hon. William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 Four instances are referenced in Knox's complaint: (1) In early 1997, Knox was assigned to represent Gary Lee Fisher. In reliance on the suspension, the CDC prevented Knox from visiting or corresponding with her client. In October 1997, Knox sent Fisher a copy of a federal petition for writ of habeas corpus that she had filed on his behalf. Refusing to deliver the petition, the prison staff returned it to Knox; (2) In April 1997, Knox was assigned to represent Michael Collins. Again, she was not permitted to visit or correspond with her client; (3) In June 1997, Knox sent her client/husband William Packer a copy of a traverse she had filed on his behalf. The prison staff refused to deliver it, stating that the ban precluded Knox from sending any legal documents to Packer; and (4) In October 1997, Knox was assigned to represent Anthony Oliver. In reliance on the suspension, Knox was refused her request to have a legal visit with her client.
 
 
 [2]
 The Second Amended Complaint was filed on February 11, 1998.
 
 
 [3]
 A similar result has been reached in the ERISA context. See Pisciotta v. Teledyne Indus., 91 F.3d 1326, 1332 (9th Cir. 1996) (finding that a cause of action accrued upon the freezing of appellants' ERISA reimbursement amounts and that there was not a continuing violation each and every time the appellants were entitled to a reimbursement payment).
 
 
 [4]
 With regard to being denied visitation and correspondence privileges with inmates Gary Lee Fisher and Michael Collins, Knox alleges as to each that "[t]he suspension of Ms. Knox's legal visitation and correspondence rights prevents her from meeting with her client to discuss his case." (emphasis added). As to the traverse filed on behalf of William Packer, the complaint alleges that "the ban precluded Ms. Knox from sending any legal documents to Mr. Packer." (emphasis added). And with regard to requests to visit inmate Anthony Oliver, the complaint alleges that "the warden responded that, after checking with CDC officials in Sacramento and in reliance on the suspension of Ms. Knox's legal correspondence and visitation rights, he was refusing Ms. Knox's request to have a legal visit with her client. (emphasis added).
 
 
 [5]
 In Knight, the Eleventh Circuit held that each time eligible employees were denied overtime pay, it constituted a new violation of the FLSA that restarted the statute of limitations. See Knight , 19 F.3d at 581. In Pisciotta, this Court held that each new denial of a reimbursement payment under an ERISA plan did not constitute a new and separate violation that restarted the statute of limitations. See Pisciotta, 91 F.3d at 1331. Both cases involved the wrongful denial of a payments to which the plaintiffs were entitled, yet each case reached a different outcome. Notably, the holding in Knight turned upon the fact that the employees' cause of action did not require any reference to the city's original decision to deny overtime pay. See Knight, 19 F.3d at 583 ("[T]hey do not require reference to any action taken by the City outside the limitations period."). In contrast, Knox is challenging her original suspension, which requires reference to events that occurred outside the limitations period. This is precisely the result that a statute of limitations is designed to prevent.
 
 
 SCHWARZER, Senior District Judge, Dissenting:
 
 21
 I respectfully dissent. The majority opinion's analysis misconceives the issue and its citations do not support its conclusion.
 
 
 22
 We must begin by identifying the underlying right at issue. Knox claims that the defendants interfered with her right to pursue her profession as a lawyer. That such a right exists is beyond question. See, e.g., Gabbert v. Conn, 131 F.3d 793, 800-01 (9th Cir. 1997) ("the Fourteenth Amendment protects an individual's right to practice a profession free from undue and unreasonable state interference . . ."), rev'd on other grounds, 526 U.S. 286 (1999); see also Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570-73, 576-77 (1972). The question this case raises is whether CDC's withdrawal of Knox's legal mail and visitation rights at all CDC facilities and with all CDC inmates constitutes an unreasonable interference.
 
 
 23
 The second amended complaint alleges that in 1997, CDC refused Knox's request for a legal visit with her client, Anthony Oliver; that in October 1997, she sent legal mail to her client, Gary Lee Miller, which was not delivered to him but was instead returned to her by CDC; that in April 1997, CDC prevented her from seeing her client, Michael Collins; and that in June 1997, she sent a legal document to her client, William Packer, through the regular mail, which was not delivered but instead returned to her by CDC. This action was filed on July 21, 1997, well within one year of these four incidents.[1]
 
 
 24
 The majority holds the action barred because it was filed more than one year after receipt of the 1996 letter from CDC extending Knox's prior suspension and withdrawing her legal mail and visitation rights at all CDC institutions and with all CDC inmates. It does so based on the rationale that Knox's claim asserts only a continuing impact of a past violation and is thus not actionable. But its reliance on the decision in Delaware State College v. Ricks, 449 U.S. 250 (1980),[2] is misplaced. Ricks charged that the College had discriminated against him when it denied him tenure. It was the College's policy to give junior faculty members denied tenure a terminal contract to teach for one additional year, and Ricks was offered and accepted just such a contract. He later filed an EEOC charge and a §§ 1983 action. The Court held that his actions were barred because the time began to run from the unlawful employment practice which was the denial of tenure, not the end of the one-year terminal contract. Id. at 257. Notably, it stated, "It appears that termination of employment at Delaware State is a delayed but inevitable, consequence of the denial of tenure." Id. But CDC's various denials of access, albeit referenced to the earlier letter, were not"a delayed but inevitable consequence" of the earlier announcement. They were the result of contemporary decisions, i.e., to reject visitation requests or to return mail, and each constitutes a separate and independent violation of Knox's right to practice her profession without regard to the continuing violation theory.[3]
 
 
 25
 To the extent the continuing violation doctrine is relevant here at all, it is relevant only to otherwise actionable incidents occurring more than one year before the filing of the action, i.e., the 1996 letter.[4] Gutowsky v. County of Placer, 108 F.3d 256 (9th Cir. 1997),[5] is squarely applicable. Gutowsky alleged an "ongoing practice and policy that denied opportunity to women to move into the equipment operating positions." Id. at 259. Citing Reed v. Lockheed Aircraft Corp. , 613 F.2d 757 (9th Cir. 1980),[6] the court said,
 
 
 26
 Gutowsky presents specific examples of discrimination which "are not the basis of her charge of discrimination" but rather "are but evidence that a policy of discrimination pervaded [her employer's] personnel decisions." Indeed, Gutowsky contends that the widespread policy and practices of discrimination of which she complains continued every day of her employment, including days that fall within the limitation period. Id. at 260 (citation omitted). Similarly, Williams v. Owen-Illinois Inc., 665 F.2d 918 (9th Cir. 1982),[7] compels reversal of the judgment below. There, the court held that the trial court erred in holding "that the continuing violations doctrine did not apply to discriminatory placements or denials of promotions," stating:
 
 
 27
 The reason is that appellants were entitled to base claims on such discriminatory acts if they could show that these acts continued as violations because the supporting discriminatory policy carried forward into the limitations period and had its effect on employees.
 
 
 28
 Id. at 924. So here, Knox is entitled to base claims on the unlawful denial of access if she can show that the 1996 determination to exclude her continued as a violation because this supporting unlawful policy carried forward into the limitations period and had an effect on her.
 
 
 29
 The majority's error lies in its confusion between termination cases in which the unlawful act is complete and subsequent consequences are not actionable, and a case such as this where the unlawful conduct is ongoing. This is clearly shown by Grimes v. City and County of San Francisco , 951 F.2d 236 (9th Cir. 1991),[8] in which the court said:The Supreme Court has held that the continuing violations doctrine does not give new life to time-barred termination related claims, even where the effects of the termination are not, as here, immediately felt. Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (citing Abramson v. University of Hawaii, 594 F.2d 202, 209 (9th Cir. 1979)).[9]
 
 
 30
 This court has also held on several occasions that the continuing violations doctrine does not apply to employee termination cases. The continuing violation doctrine is intended to allow a victim of systematic discrimination to recover for injuries that occurred outside the applicable limitations period, as where an employee has been subject to a policy against the promotion of minorities. Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982).
 
 
 31
 Id. at 238 (emphasis added). See also Hoesterey v. City of Cathedral City, 945 F.2d 317, 320 (9th Cir. 1991) (holding that "the simple notification that [plaintiff ] was being discharged at a later date would not be sufficient to trigger the statute of limitations period").[10] So here, the simple notification that legal mail and visitation rights were being withdrawn would not be sufficient to trigger the statutory period on subsequent denials of constitutional rights.
 
 
 32
 I agree that, to the extent Knox relies on a continuing violation, she must "state facts `sufficient . . .[to] support[ ] a determination that the "alleged discriminatory acts are related closely enough to constitute a continuing violation,' " and that one or more of the acts falls within the limitation period." See supra p. 10445, quoting DeGrassi v. City of Glendora, 207 F.3d 636, 645 (9th Cir. 2000) (citation omitted). The acts complained of are closely related because all flowed from the 1996 letter and several fell within the limitations period. Thus, the predicate for application of the continuing violation theory is established, at least to the extent necessary to survive the motion to dismiss.
 
 
 33
 I would reverse and remand for trial.
 
 
 
 Notes:
 
 
 [1]
 This list does not include the July 30, 1996, modification of the ban as to death row client Lucky, which Knox also alleges falls within the applicable one-year period.
 
 
 [2]
 Cited supra pp. 1013-1014.
 
 
 [3]
 At oral argument, counsel for defendants conceded that if the earlier letter had not been sent, each application of CDC's exclusionary policy during the statutory period would be actionable. Even aside from that concession, suppose CDC had adopted a regulation in 1996 to bar attorneys such as Knox from access to inmates. It surely would not be said that the statute of limitations runs from the adoption of the regulation rather than from its application in particular cases. See, e.g., Kuhnle Bros., Inc., v. County of Geauga, 103 F.3d 516, 521-22 (6th Cir. 1997) ("A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years of its enactment."). For that matter, it is highly unlikely that a court would have entertained a §§ 1983 action based solely on issuance of the 1996 letter.
 
 
 [4]
 Even if the majority's analysis were correct, therefore, the judgment would have to be reversed.
 
 
 [5]
 Cited supra p. 1013.
 
 
 [6]
 Cited supra p. 1013.
 
 
 [7]
 Cited supra p. 1013.
 
 
 [8]
 Cited supra p. 1013.
 
 
 [9]
 Cited supra p. 1013.
 
 
 [10]
 Cited supra pp. 1013, 1015-1016.