**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MADERO L. POUNCIL,
*Plaintiff-Appellee*,

v.

JAMES E. TILTON, Director, CDC;
MATTHEW CATE, Secretary of the
CDC; D. FOSTON, Facility Captain;
and W. MARTEL, Warden/Acting
Warden, MCSP,
*Defendants-Appellants*.

No. 10-16881

D.C. No.
CIV S-09-1169-
LKK-CMK-P

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
March 14, 2012—San Francisco, California

Filed November 21, 2012

Before: Consuelo M. Callahan and Carlos T. Bea, Circuit
Judges, and Mark W. Bennett, District Judge.[*]

Opinion by Judge Bennett

---

[*] The Honorable Mark W. Bennett, District Judge for the U.S. District
Court for the Northern District of Iowa, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel affirmed the district court's denial of prison officials' motion to dismiss a prisoner civil rights complaint on statute of limitations grounds.

The prisoner asserted that the denials by prison officials of his request for a conjugal visit with his wife violated the Religious Land Use and Institutionalized Persons Act and the First Amendment by interfering with his practice of a tenet of his Islamic faith requiring him to marry, consummate his marriage, and father children. The panel held that because the prisoner's claim was based on an independently wrongful, discrete act in 2008, which was the denial of his request for conjugal visits with his second wife, his claims were not time-barred, notwithstanding the denial, pursuant to the same regulation, of his prior request for conjugal visits with his first wife in 2002.

### COUNSEL

Tritia M. Murata of Morrison & Foerster, Los Angeles, California, for the plaintiff-appellee.

Kamala D. Harris, Attorney General of California; Rochelle C. East, Sr. Asst. Attorney General; Vickie P. Whitney,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Supervising. Dep. Atty. General; Misha D. Igra, Dep. Atty. General, Sacramento, California, for defendants-appellants.

**OPINION**

BENNETT, District Judge:

A state prisoner asserts that denials by prison officials of his request for a conjugal visit with his wife violated the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment to the United States Constitution by interfering with his practice of a tenet of his Islamic faith requiring him to marry, consummate his marriage, and father children. The immediate question, however, is not the merits of his claims, but when the limitations period began to run on them. Was it in 2008, when the prisoner's request for a conjugal visit with his second wife was denied pursuant to a prison regulation that had been in force, essentially unchanged, since 1996, or in 2002, when the prisoner's request for a conjugal visit with his first wife was denied pursuant to that regulation? The answer turns not only on the precise nature of the prisoner's claims, but on which of two apparently conflicting lines of authority is controlling on the accrual date of the prisoner's claims. Indeed, this appears to be the kind of case, forecast by the United States Supreme Court, "where it will be difficult to determine when the [limitations] time period should begin to run." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 n.7 (2002). It is symptomatic of the difficulty of the question that two district judges in the Eastern District of California reached contrary results on it, in two very similar cases, within the space of a few months. The appellant prison official contends that one of the district judges, the one in this

case, got it wrong, when he denied the prison official's motion to dismiss the prisoner's claims as untimely. We affirm.

## 1. BACKGROUND

### a. Factual Background

Plaintiff-appellee Madero L. Pouncil is a California state prisoner serving a sentence of life imprisonment without parole (LWOP) at Mule Creek State Prison (MCSP). He alleges in his *pro se* Complaint, pursuant to 42 U.S.C. § 1983, that he is a Muslim, that marriage is one of the most important institutions in Islam and is incumbent on every Muslim, and that the main duties of a Muslim to his or her spouse are to consummate their marriage to solidify the validity of the marriage and to have sexual relations as a form of worship.

Pouncil married his first wife in 1999 while Pouncil was already in prison.[1] In 2002, Pouncil requested a conjugal visit with his wife, but that request was denied. On March 26, 2002, Pouncil filed a grievance stating, in part, "I'm told, 'I can't apply for a Family visit, cause of the time I'm serving, and nature of the crime committed,'" but that the denial of a

---

[1] Although this matter is before the court on an appeal from the denial of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which ordinarily would limit this court to consideration of allegations in the Complaint, *see, e.g., Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008), at the defendant's request, the magistrate judge to whom the defendant's motion to dismiss was referred took judicial notice of marriage certificates indicating that Pouncil was married on September 16, 1999, and remarried on July 14, 2007.

conjugal visit restricted him from complying with a duty of his religion. His grievance was denied as was his "Second Level" appeal, because a prison regulation, CAL. CODE REGS. tit. 15, § 3174, did not permit LWOP prisoners to have conjugal visits.

The parties agree that Pouncil was subsequently divorced from his first wife. The parties also agree that Pouncil remarried on July 14, 2007, and that, on or about July 21, 2008, Pouncil submitted another request for conjugal visits. That request was denied on August 1, 2008, by a counselor, who stated, "Per CCR 3177(b)(2) LWOP inmates are not permitted family visits." The regulation on which the counselor relied is essentially the same one cited in the denial of Pouncil's request for a conjugal visit in 2002, which had been recodified in 2006 as § 3177. Pouncil's administrative appeals were denied at the "Informal Level," on August 7, 2008; in a "Second Level Appeal Response," dated September 3, 2008; and in a "Director's Level Decision," dated December 9, 2008. The "Director's Level Decision" expressly stated that it "exhaust[ed] the administrative remedy available to the appellant within CDCR."

### b.  *Procedural Background*

On April 27, 2009, Pouncil signed, and on April 29, 2009, the Clerk of Court for the United States District Court for the Eastern District of California filed, Pouncil's *pro se* Complaint pursuant to the Civil Rights Act, 42 U.S.C. § 1983. The Complaint named as defendants James Tilton, identified as the Director of the California Department of Corrections and Rehabilitation (CDCR); D. Foston, identified as Facility Captain; and M. Martel, identified as the Warden or Acting Warden at MCSP. In his Complaint, Pouncil stated

that he had brought the lawsuit against the CDCR "for implementing a rule to the California Code of Regulation (3177(b)(2)) that violates Petitioner['s] Constitutional right to practice his religion and be married as a Muslim under the RLUIPA act. . . . Petitioner all so [sic] claims a violation of his 14th. and 8th. amendment rights." Complaint at 4. Pouncil also alleged that "[t]his rule dose [sic] not provide intimate time (family visiting) for Muslim Inmates serving a life without parole term, wherefore making it impossible for Petitioner to consummate his marriage/have sexual relations with his wife and practice his religion and perform his duties to his wife as commanded by (ALLAH) and affirmed in the teaching of prophet Muhammad. [A]nd by denying Petitioner the right to perform his religious duties to his wife or potential wife is to deny him his right to be married as a Muslim." Complaint at 5. Pouncil sought the following relief: "Reinstate Family Visits for Lifers, and Life without the possibility of parole Inmate so I can fulfill my duties religiously to my wife, and guide my children in my family with direct understanding of my faith." Complaint at 2.

Pouncil's Complaint makes no express mention of his applications for conjugal visits in either 2002 or 2008 or denials of those applications. It does, however, aver that Pouncil completed the administrative review process for his claims, explaining what happened at each level of administrative review. The administrative exhaustion that Pouncil cites relates entirely to his 2008 application for a conjugal visit.

The docket below reflects that Tilton and Foston filed waivers of service of the Complaint, but that Martel was never served with the Complaint. Tilton and Foston filed a motion to dismiss arguing, among other things, that Pouncil's

Complaint is time-barred. The defendants argued that Pouncil's claims accrued in 2002 when he first filed an inmate grievance concerning conjugal family visitation, so that the statute of limitations had run by 2009, when Pouncil filed suit. Pouncil argued that his claims accrued only after he remarried in 2007, and that his action relates only to matters addressed in his 2008 inmate grievance, so that his lawsuit is timely.

On February 19, 2010, a magistrate judge filed Findings and Recommendations concerning the defendants' motion to dismiss. The magistrate judge found that the applicable statute of limitations for a § 1983 claim, using California's statute of limitations for personal injury actions, was two years, and that the statute of limitations was tolled while the prisoner exhausted administrative remedies. The magistrate judge dismissed any contention that an amendment of the pertinent prison regulation in 2007 affected the accrual analysis, because the portion of the regulation preventing Pouncil from having conjugal visits had been in place unchanged since 1996. The magistrate judge construed Pouncil's claims as, in essence, a constitutional challenge to the prison regulation prohibiting LWOP inmates from having conjugal family visits and concluded that this regulation remained the same and was applicable to Pouncil without regard to whom he was married at the time. In other words, the magistrate judge concluded, Pouncil's claims were not tied to a particular spouse. Thus, the magistrate judge concluded that Pouncil knew from his experience in 2002 that he would not be allowed conjugal visitation with any wife so long as he remained an LWOP inmate. The magistrate judge also dismissed application of a continuing violation theory, because the denial of Pouncil's request for a conjugal visit in 2008 was simply an effect of the regulation that Pouncil had

originally challenged in 2002. Therefore, the magistrate judge recommended that the defendants' motion to dismiss be granted.

Pouncil filed objections to the magistrate judge's Findings and Recommendations on March 12, 2010, and, consequently, on March 31, 2010, a district judge[2] conducted a *de novo* review of the case. The district judge declined to adopt the magistrate judge's Findings and Recommendations. In the district judge's view, Pouncil's complaint did not allege an injury from the denial of his request for conjugal visits with his ex-wife in 2002, but an injury from the denial of his request for conjugal visits with his current wife on August 1, 2008. The district judge also concluded that the 2008 denial constituted an individual, actionable injury upon which Pouncil had standing to bring suit, so that his action did not accrue until his request was denied on August 1, 2008.

The district judge found that the two-year statute of limitations for a § 1983 claim would not run until August of 2010, and that the four-year statute of limitations for a RLUIPA claim would not run until August of 2012. Thus, he found that Pouncil's claims, filed in 2009, were timely. The district judge cited, without comment, *Henderson v. Hubbard*, 2010 WL 599886 (E.D. Cal. Feb. 18, 2010), in which another district judge in the same district adopted a different magistrate judge's findings and recommendation to dismiss a similar claim on timeliness grounds. The district court did, however, grant the motion to dismiss as to defendant Foston, because defendant Foston was not in any

---

[2] The Honorable Lawrence K. Karlton, District Judge for the U.S. District Court for the Eastern District of California.

position to implement the injunctive relief that Pouncil was requesting, and substituted the current Secretary of the CDCR, Matthew Cate, for defendant Tilton, who had retired.[3]

On June 10, 2010, on defendant Tilton's motion, the district judge certified for interlocutory appeal the question of whether Pouncil's claims are barred by the statute of limitations.[4]  This case was stayed in the district court until a mandate issues from this court.  This court granted Tilton's subsequent petition for permission to appeal the certified question of whether Pouncil's claims are barred by the statute of limitations and directed appointment of *pro bono* counsel to represent Pouncil on appeal.

## 2.  *LEGAL ANALYSIS*

### a.  *Applicable Standards*

Pouncil asserts claims pursuant to the RLUIPA and the First Amendment to the United States Constitution.[5]  The RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of

---

[3] Like the parties, for the sake of simplicity, we will continue to identify the defendant-appellant as Tilton, rather than Cate.

[4] The district judge declined Tilton's request that he also certify for interlocutory appeal the scope of the lawsuit and who is a party.

[5] Tilton argues that the only claim on which Pouncil was allowed to proceed, after initial review, was his RLUIPA claim.  However, the district judge treated both Pouncil's RLUIPA claim and his First Amendment claim as viable for purposes of the statute of limitations analysis, and we will do the same, taking no position on whether Pouncil's First Amendment claim is also properly before the court.

a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a). The First Amendment of the United States Constitution prohibits government restrictions on the fundamental right to freely exercise one's religious beliefs. *See* U.S. CONST. amend. I. Section 1983 of title 42 of the United States Code provides a cause of action against any person who, acting under the color of state law, abridges rights created by the laws of the United States. "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987).

The parties agree that, because there is no specified statute of limitations for an action under 42 U.S.C. § 1983, the federal courts look to the law of the state in which the cause of action arose and apply the state law of limitations governing an analogous cause of action. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). The parties also agree that the analogous cause of action in this case is California's personal injury action, which has a two-year statute of limitations. *See Maldonado v. Harris*, 370 F.3d 945, 954-955 (9th Cir. 2004). Similarly, they agree that the RLUIPA does not contain its own statute of limitations period, but that civil claims, such as RLUIPA claims, "arising under an Act of Congress enacted after [December 1, 1990]," have a four-year period of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

What the parties do dispute is when the statutes of limitations on Pouncil's claims began to run. A statute of limitations begins to run on the date on which the plaintiff's

claim "accrues." *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). Federal law determines when a cause of action for a Section 1983 claim accrues and, hence, when the statute of limitations begins to run. *See Wallace*, 549 U.S. at 388. Under federal law, accrual occurs when the plaintiff has a complete and present cause of action and may file a suit to obtain relief. *Id.*; *see also Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996) ("Under federal law, 'the limitations period accrues when a party knows or has reason to know of the injury' which is the basis of the cause of action." (quoting *Golden Gate Hotel Ass'n v. San Francisco*, 18 F.3d 1482, 1486 (9th Cir. 1994))). An action ordinarily accrues on the date of the injury. *Ward v. Westinghouse Canada, Inc.*, 32 F.3d 1405, 1407 (9th Cir. 1994). A federal claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action. *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991) (quoting *Trotter v. Int'l Longshoreman's and Warehouseman's Union,* 704 F.2d 1141, 1143 (9th Cir. 1983)).

When the statute of limitations begins to run for an action at law is reviewed de novo. *See Oja v. U.S. Army Corps. of Engineers*, 440 F.3d 1122, 1127 (9th Cir. 2006); *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 780 (9th Cir. 2002). Whether a claim is barred by the statute of limitations is also reviewed de novo. *Orr,* 285 F.3d at 780. However, "[t]he question of when a claim accrues is a fact intensive inquiry, and we have held that a district court's factual finding concerning when a claim accrues is entitled to deferential review." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 691 (9th Cir. 2005).

### b. Arguments Of The Parties

Tilton asserts that Pouncil is now challenging a regulation that he originally challenged in 2002, when he was married to his first wife, so that his claims accrued in May 2002, when the warden of the MCSP notified him that, in accordance with provisions of the California Code of Regulations, he would not be permitted to have conjugal visitation with any spouse because of his life sentence. Tilton relies on *Knox v. Davis*, 260 F.3d 1009, 1014 (9th Cir. 2001), for the proposition that "[a]ll of the allegations in the complaint regarding Pouncil's inability to have sex with his second wife are merely the delayed, but inevitable, consequence of the original decision that he is subject to regulations preventing LWOP inmates from participating in conjugal visits." Appellant's Brief at 16.

In contrast, Pouncil argues that he is challenging the denial of his 2008 application for a conjugal visit with his second wife. Pouncil relies on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), to contend that the August 2008 denial of his request for a conjugal visit with his second wife was a discrete act that started a new clock running for the filing of his claims.

In reply, Tilton argues that Pouncil's argument relies on a transformation of his claims from challenges to the regulation into challenges to the denial of a specific request for a conjugal visit. Tilton points out that Pouncil's Complaint never even mentions that he had been denied a conjugal visit in 2008. Instead, it challenges "implementation" of a regulation preventing inmates serving LWOP from participating in conjugal visits.

We conclude that when Pouncil's claims accrued depends, in part, on what those claims are.

### c. The Nature Of Pouncil's Claims

Pouncil filed this action *pro se*. We have repeatedly stated that "[w]e construe pro se complaints liberally." *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011); *Hamilton v. Brown*, 630 F.3d 889, 893 (9th Cir. 2011). This rule protects the rights of *pro se* litigants to self-representation and meaningful access to the courts, *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998), and we have recognized that it is "'particularly important in civil rights cases.'" *Johnson v. State of California*, 207 F.3d 650, 653 (9th Cir. 2000) (quoting *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992)).

Tilton is correct that Pouncil nowhere mentions the 2008 denial of his application for a conjugal visit in his *pro se* Complaint. On the other hand, neither does Pouncil mention the 2002 denial of his application for a conjugal visit with his first wife. The question is whether his failure to identify the 2008 denial as the specific basis for his claims is dispositive of the nature of his claims. We think it is not, giving Pouncil's *pro se* Complaint the liberal construction to which it is entitled. *See Silva*, 658 F.3d at 1101; *Johnson*, 207 F.3d at 653.

First, Tilton is correct that Pouncil stated in his Complaint that he had brought the lawsuit against the CDCR "for *implementing* a rule to the California Code of Regulation (3177(b)(2)) that violates Petitioner['s] Constitutional right to practice his religion and be married as a Muslim under the RLUIPA act." Complaint at 4 (emphasis added).

Nevertheless, we do not agree with Tilton's argument that claims based on "implementing" a rule equate with claims based on "enacting" or "adopting" the rule. Appellant's Reply at 2l-23. A liberal construction of Pouncil's Complaint would just as reasonably read "implementing" the rule to mean "applying" the rule to him. *See, e.g.,* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 583 (10th ed. 1995) (defining "implement," *inter alia*, as "CARRY OUT, ACCOMPLISH; *esp.* to give practical effect to and ensure of actual fulfillment by concrete measures"); ROGET'S II: THE NEW THESAURUS, www.education.yahoo.com/reference/thesaurus/?=implement (last accessed May 15, 2012) (identifying "implement" and "apply" as synonyms of "use" and identifying "implement" as a synonym of "apply"). Second, in his Complaint, Pouncil explains that he has exhausted administrative remedies by citing the levels of review and summarizing the results of those reviews in a manner that plainly matches the administrative steps of his 2008 grievance, the only grievance involving a third level of administrative review. *See* Complaint at 2. Third, Pouncil cites only the version of the rule as it was recodified in 2006 as § 3177, not as it existed in 2002, when it was codified as § 3174. Liberally construed, Pouncil's Complaint suggests that the focus of Pouncil's challenges is the application of the rule to him in 2008.

Tilton argues that, by suing the Secretary of the CDCR for injunctive relief, Pouncil has also necessarily challenged the regulation itself, not the denial of his request for a conjugal visit in 2008. Tilton points out that he was not personally involved in the specific denial of Pouncil's request. This argument is too clever by half, in the context of *pro se* pleadings, because it relies on precisely the kind of technical requirements that liberal construction of *pro se*

pleadings is intended to mitigate. *See Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).

It also is not entirely clear whether the injunctive relief that Pouncil seeks is limited to relief *for him* from the challenged regulation, or relief for *all* LWOP prisoners. In his Complaint, Pouncil sought the following relief: "Reinstate Family Visits for *Lifers*, and Life without the possibility of parole *Inmate* [sic] *so I can fulfill my duties religiously* to my wife, and guide my children in my family with direct understanding of my faith." Complaint at 2 (emphasis added). This statement ambiguously refers to all "Lifers," but only to one LWOP "Inmate," and to relief allowing Pouncil to fulfill his religious duties. When read in the context of Pouncil's requests for relief in the administrative proceedings, however, it appears that Pouncil seeks relief from application of the regulation *to him*. In his August 4, 2008, Appeal Form, Pouncil requested the following action as relief: "I would like my family visiting previlleges [sic] be reinstated and to stay as such, until I'm set free where I can continue to practice my Religious beliefs, and be an upstanding citizen." In a "Second Level Appeal Response," the warden of the MCSP characterized Pouncil's request for relief to be "to have his right to Family Visiting restored to him." The "Director's Level Response" also characterized Pouncil's request for relief to be "that his family visiting privileges be reinstated and to stay as such until the appellant is released." Thus, the relief that Pouncil requests does not necessarily demonstrate that he has asserted challenges to the regulation itself, rather than claims based on denial of his request for a conjugal visit in 2008.

Moreover, Tilton (or his successor), as Secretary of the CDCR, is the proper defendant on a claim for prospective

injunctive relief from a prison regulation, because he would be responsible for ensuring that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to Pouncil's claims. *See, e.g., Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (the prison warden was the proper defendant for a claim of injunctive relief, notwithstanding his lack of personal involvement in the challenged conduct, because he would be responsible for ensuring that the injunctive relief was carried out). Tilton cannot raise qualified immunity to such a claim. *See Vance v. Barrett*, 345 F.3d 1083, 1091 n.10 (9th Cir. 2003) (noting, "[A] defense of qualified immunity is not available for prospective injunctive relief." (citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989)). Thus, Pouncil's prayer for injunctive relief in no way demonstrates conclusively that his claims are *not* premised on denial of his application for a conjugal visit in 2008, nor does it demonstrate that Pouncil's appellate counsel has reconfigured his claims to attempt to evade the time-bar that Tilton asserts. Rather, liberally construed, we read Pouncil's claims to be challenges to the denial of his 2008 request for a conjugal visit.

### d. *Discrete Act Versus Inevitable Consequence*

Once Pouncil's claims are understood as arising from the 2008 denial of his application for a conjugal visit, the question is, when did such claims accrue? What makes this question particularly daunting here is that two different lines of authority appear to lead to different conclusions. Tilton relies on one line of authority to argue that, even if Pouncil is challenging the 2008 denial of his request for a conjugal visit, that denial is simply the inevitable consequence of the 2002 denial of his first request for a conjugal visit pursuant to the

same regulation. Relying on a different line of authority, Pouncil contends that the 2008 denial was a discrete act, notwithstanding a prior denial pursuant to the same regulation.

### i. The Ricks/Knox line

Appellants rely on *Knox*, 260 F.3d at 1014, for the proposition that "all of the allegations in the complaint regarding Pouncil's inability to have sex with his second wife are merely the delayed, but inevitable, consequence of the original decision that he is subject to regulations preventing LWOP inmates from participating in conjugal visits." Appellant's Brief at 16. Tilton argues that Pouncil's cause of action, therefore, accrued on the date that he received the denial of his first request for conjugal visits, in May of 2002. Appellant's Brief at 13.

*Knox* involved an attorney who, after receiving a letter on January 20, 1996, revoking all of her legal mail and visitation rights to all inmates at all penal institutions in California, continued to receive denials of these rights between January 20, 1996, and July 21, 1997, when she filed suit. *Knox,* 260 F.3d at 1011-1012. The denials subsequent to the January 20, 1996, letter, relied on the suspension implemented in that letter as the basis for denying Knox either legal visitation or correspondence privileges with inmates. *Id.* at 1012. Knox conceded that her § 1983 claim accrued on January 20, 1996. *Id.* at 1013. She argued, however, "that each time that she was denied access to one of her clients housed in a CDCR facility, a new cause of action ar[ose] under the continuing violation theory." *Id.*

This court explained that, since Knox had not alleged a system or practice of discrimination, the only way that she could hope to show a continuing violation was to "'state facts sufficient . . . [to] support[ ] a determination that the alleged discriminatory acts related closely enough to constitute a continuing violation, and that one or more of the acts falls within the limitations period.'" *Id.* (quoting *DeGrassi v. City of Glendora*, 207 F.3d 636, 645 (9th Cir. 2000)). This court rejected Knox's continuing violation argument, however, because this court had "repeatedly held that a mere continuing *impact* from past violations is not actionable." *Id.* (internal quotation marks and citations omitted) (emphasis in the original). This court held,

> Knox's cause of action accrued when she received Tristan's permanent and complete suspension letter on January 20, 1996. The continuing violation doctrine is inapplicable because Knox has failed to establish that a new violation occurs each time she is denied her visitation or mail privileges. Rather, the CDC's subsequent and repeated denials of Knox's privileges with her clients is merely the continuing effect of the original suspension.

*Knox*, 260 F.3d at 1013.

This court concluded that the outcome in *Knox* was compelled by the United States Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250 (1980). *See Knox*, 260 F.3d at 1013-14. In *Ricks*, the Supreme Court considered whether a college professor had timely complained under Title VII that he had been denied academic

tenure because of his national origin.  449 U.S. at 252.  Ricks had received a letter on June 26, 1974, informing him of the denial of tenure, but renewing his contract until the end of the 1974-75 school year.  *Id.* at 253-54.  The district court had held that the statute of limitations began to run on Ricks's claim on the date he had been notified that he would be offered a 1-year "terminal" contract, but the Third Circuit Court of Appeals reversed, concluding that the statute of limitations did not begin to run until Ricks's "terminal" contract expired on June 30, 1975.  *Id.* at 255.

The Supreme Court found that Ricks had not alleged any discriminatory acts that continued until, or that occurred at the time of, the actual termination of his contract.  *Id.* at 257.  To the contrary, the Court concluded, the "termination of employment at Delaware State [wa]s a delayed, but inevitable, consequence of the denial of tenure."  *Id.* at 257-58.  In short, "the only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks."  *Id.* at 258.  This was so, "even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later."  *Id.* (emphasis in the original).  The emphasis in the statute of limitations analysis, the Court concluded, is not on *effects*, but "is [upon] whether any present *violation* exists.'"  *Id.* (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977), with emphasis in the original).

This court explained that the attorney plaintiff in *Knox*, like the college professor plaintiff in *Ricks*, "had notice of all the wrongful acts she wished to challenge at the time of the suspension letter because the letter informed her that she was permanently denied all visitation or mail privileges."  *Knox*,

260 F.3d at 1014. Similarly, Tilton argues—not without some appeal—that Pouncil also had notice of all the wrongful acts that he wished to challenge at the time that he received the 2002 notice of denial of his request for a conjugal visit because that denial informed him that he was permanently barred from conjugal visits as an inmate serving LWOP.

### ii.  The **Morgan/Cherosky** *line*

There is, however, another line of authority that appears to lead to a conflicting result—*i.e.*, to the conclusion that Pouncil's claims arising from the denial of his request for conjugal visits in 2008 are timely, notwithstanding the prior denial of a request for conjugal visits in 2002.

Subsequent to *Knox*, the United States Supreme Court decided *Morgan*, 536 U.S. 101.  In *Morgan*, which, like *Ricks,* was an employment discrimination case, the plaintiff filed a charge of discrimination and retaliation against his employer.   536 U.S. at 105.   Some of the allegedly discriminatory acts about which Morgan complained occurred within 300 days of the time that he filed his charge with the EEOC—that is, within the 300-day limitations period for filing such a charge—but many took place prior to that time period.  *Id.* at 106.  Morgan argued that the various acts, including those that occurred prior to the 300-day time period, were part of "an unlawful employment practice" that constituted an ongoing violation.  *Id.* at 110.  What is instructive here, however, is not the *Morgan* Court's analysis of the continuing violation doctrine, but its explanation of what constitutes a "discrete act" that starts the running of a limitations period.

The Court derived several principles from its prior cases, including *Ricks*, *Evans*, *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976), and *Bazemore v. Friday*, 478 U.S. 385 (1986) (per curiam):

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Morgan*, 536 U.S. at 113. Thus, *Morgan* instructs that a court must determine whether a claim is based on an independently wrongful, discrete act, and if it is, then the claim accrues, and the statute of limitations begins to run, from the date of that discrete act, even if there was a prior, related past act.

In *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003), this Court discussed the application of *Morgan* to claims by employees of the United States Postal Service that the Postal Service had violated their rights pursuant to the Rehabilitation Act by denying their requests for respirators.

In order to bring a claim under the Rehabilitation Act, a federal employee was required to consult with an EEOC counselor within 45 days of the effective date of the action. *See Cherosky*, 330 F.3d at 1245. Failure to comply with the 45-day consultation requirement was fatal to a federal employee's claim. *Id.* The employees in *Cherosky* did not initiate contact with an EEOC officer within 45 days of the denial of their requests to wear respirators and could not point to any discrete, discriminatory act that occurred within the 45-day period. *Id.* at 1245-46. The employees argued, however, that their claims were timely under the continuing violations doctrine. *Id.* at 1246.

In *Cherosky*, this court, relying on *Morgan*, determined that discrete acts, such as the denials of the employees' requests for respirators, are only timely where such acts occurred within the limitations period, but that the postal employees had not alleged that any discriminatory acts had occurred after the initial denials, which were outside of the limitations period. *See id.* This court quoted with approval the district court's observation that the "'heart of plaintiffs' complaint does not stem from the policy regarding the use of respirators, but rather from the individualized decisions that resulted from implementation of a policy originating from OSHA.'" *Id.* at 1247. The court concluded that "these individualized decisions are best characterized as discrete acts, rather than as a pattern or practice of discrimination." *Id.*

The *Cherosky* court compared the "wrong" alleged by the postal employees, the denial of each application for a respirator, to the "wrong" in *Bazemore*, 478 U.S. at 395, the receipt of a periodic paycheck pursuant to a discriminatory salary policy. The *Cherosky* court explained, "Just as the

wrong in *Bazemore* accrued each time the salary policy was implemented, the alleged wrong here occurred and accrued when the policy was invoked to deny an individual employee's request."  *Cherosky*, 330 F.3d at 1247.

Thus, *Cherosky* and *Morgan* suggest that each time a policy is invoked to deny an individual plaintiff's request, an independently wrongful, discrete act occurs, a claim accrues, and the limitations period begins to run.  Pouncil argues that this is precisely what occurred in 2008:  The 2008 denial of his individual request for a conjugal visit was independently wrongful, and his claims accrued at that time, even though the same regulation invoked to deny the 2008 request had been invoked to deny his 2002 request for a conjugal visit.

### iii.  Reconciling the lines of authority

In *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. 618 (2007), *superseded by statute,* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat 5., another employment discrimination case, the Supreme Court clarified how the "discrete acts" language of *Morgan* could be reconciled with its prior case law, including *Ricks* and *Evans*. The Court explained,

> The instruction provided by *Evans*, *Ricks*, *Lorance [v. AT & T Tech., Inc.*, 490 U.S. 900 (1989)], and *Morgan* is clear.  The EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from

> the past discrimination.  But of course, if an
> employer engages in a series of acts each of
> which is intentionally discriminatory, then a
> fresh violation takes place when each act is
> committed.  See *Morgan, supra*, at 113, 122
> S. Ct. 2061.

*Ledbetter*, 550 U.S. at 628.  Although the Supreme Court's decision in *Ledbetter* was later superseded by statute, that decision nevertheless clarified the distinction between Ledbetter's paycheck case and Bazemore's paycheck case, on the ground that, in order to state a "present violation," Ledbetter would have to allege a current intentionally discriminatory decision that accompanied a current action, which she had failed to do.  *See Ledbetter*, 550 U.S. at 633-37 (citing  *Bazemore*, 478 U.S. at 396-97).

This court has applied the "discrete act" language of *Morgan*, as explained in *Ledbetter*, in a prisoner rights case brought pursuant to § 1983.  *See Ngo v. Woodford*, 539 F.3d 1108, 1109-10 (9th Cir. 2008).  In *Ngo*, a prison inmate serving a life sentence was informed, on December 22, 2000, after an administrative hearing, that he would be released from administrative segregation, but that he could not participate in "special programs."  539 F.3d at 1109.  Three months later, Ngo asked the deputy warden if he could play on the prison's baseball team and whether he "was entitled to participate in any and all special programs."  *Id.*  The deputy warden informed Ngo that he could participate in "any recreational programs" and that the prison's community resources manager was authorized "to review [Ngo's] request to participate in any other program."  *Id.*  Pursuant to a prison regulation, prisoners were required to  "appeal within 15 working days of the event or decision being appealed."  *Id*.

Ngo did not submit a formal appeal to the prison's Appeal Coordinator until approximately six months after the hearing decision and approximately three months after he received the response to his second request. *See id.*

This court rejected Ngo's argument that the December 22, 2000, order resulted in a continuing denial of his constitutional rights, so that the 15-day limitations period restarted each day that he was unable to participate in prison special programs:

> We rejected this argument in *Knox v. Davis*, 260 F.3d 1009 (9th Cir. 2001). *Knox* held that a limitations period began running on the date of a prison board's initial determination, when a prisoner "had notice of all of the wrongful acts she wished to challenge at the time of the [initial determination]." *Id.* at 1014. Rejecting a continuing violation theory, we explained that any continuing effects are "nothing more than the delayed, but inevitable, consequence of the [initial determination]." *Id.* And in the context of employment discrimination, the Supreme Court recently emphasized that limitations periods begin to run when the "discrete act" adverse to the plaintiff occurs—"not from the date when the effects of [that act] were felt." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 127 S. Ct. 2162, 2168, 167 L. Ed. 2d 982 (2007). Here, the December 22 determination is the discrete act adverse to Ngo, so the 15-working-day limitations period began running against him on that date rather

than on the date he actually felt the effects of
the order.

*Ngo*, 539 F.3d at 1109-10 (also concluding that the December 22 order gave the prisoner "ample notice" that he would be barred from special programs and that the partial withdrawal of that restriction by the deputy warden allowing the prisoner to participate in recreation activities did not change that fact).

Thus, the apparent conflict between the *Ricks/Knox* line of authority and the *Morgan/Cherosky* line of authority is not a conflict at all; rather, the two lines of authority identify different circumstances that lead to different accrual dates for claims. The proper question, therefore, is whether, *factually*, this is a *Ricks/Knox* case or a *Morgan/Cherosky* case. Put another way, does this case involve the delayed, but inevitable, consequence of the original 2002 decision, making Pouncil's claims arising from the 2008 decision time-barred, or an independently wrongful, discrete act in 2008, which began the running of the statute of limitations anew, notwithstanding the prior denial pursuant to essentially the same regulation in 2002? As this is a factual question, the district court's resolution is entitled to deferential review. *See Hells Canyon Pres. Council*, 403 F.3d at 691.

### e.  Application

We affirm the district judge's finding that the denial of Pouncil's request for a conjugal visit in 2008 is a separate, discrete act, rather than a mere effect of the 2002 denial. This is so, because Pouncil alleges, and the record supports, that the second denial is a stand-alone violation of Pouncil's First Amendment and RLUIPA rights from which the statute of limitations runs anew. *See Morgan*, 536 U.S. at 113. The

2008 denial is an independently wrongful "present violation," because Pouncil's claims do not rely on any acts that occurred before the statute of limitations period to establish a violation of his right to free exercise of religion or his rights under RLUIPA. *See Bazemore*, 478 U.S. at 396-97, n.6 (Brennan, concurring in part) (citing *Evans*, 431 U.S. at 558, for the proposition that the "critical question" is whether any "present violation" exists, and evaluating whether the plaintiff's claims of wrongfulness were "present violations" by considering whether they relied on prior acts). Unlike Ledbetter, who was unable to point to a later act that fully established the alleged violation, *Ledbetter*, 550 U.S. at 629, Pouncil does point to a later act, the 2008 denial, that fully establishes a First Amendment and RLUIPA violation, without reaching back to the 2002 denial to establish a necessary element of his claims. To put it another way, the 2008 denial relied on a new application of the regulation to a new request for a conjugal visit, it did not rely on the 2002 denial as barring all subsequent requests for conjugal visits.

In contrast, the cases on which Tilton relies each lacked any allegation or showing of a subsequent and separately wrongful act. For example, in *Ricks*, the college professor failed to allege or show a subsequent and separately wrongful act after notice of the denial of tenure. *See Ricks,* 449 U.S. at 257-58 (determining that the only wrongful decision alleged was a wrongful denial of tenure and not an additional wrongful discharge one year later). While the Supreme Court in *Ricks* noted that the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful," it did so based upon the finding that Ricks had pleaded only one discrete wrongful act, the denial of tenure. *See id.* at 258 (citing *Abramson v. University of Hawaii*, 594 F.2d 202, 209

(9th Cir. 1979)) (emphasis added).  In contrast, Pouncil has alleged a second, discrete wrongful act—the 2008 denial.

The failure to allege a subsequent, independently wrongful act also explains the holdings in *Knox, Cherosky*, and *Ngo*.  In *Knox*, each of the denials subsequent to the January 20, 1996, letter advising Knox that her legal mail and visitation rights had been revoked relied on that letter as the basis for denying Knox either legal visitation or correspondence privileges with inmates.  *Knox*, 260 F.3d at 1012.  Moreover, Knox acknowledged that her claim had accrued upon receipt of the letter suspending her visitation and correspondence rights.  *See id.* at 1013.  Thus, the court in *Knox* was simply never asked to consider whether each subsequent denial was a separate violation of her rights, only whether each subsequent denial was part of a continuing violation.  *Id.*  Here, in contrast, Pouncil specifically asserts that the 2008 denial of his request for a conjugal visit was a discrete act, and the 2008 denial relied on a new application of the regulation to a new request for a conjugal visit, rather than on the 2002 denial as barring all subsequent requests for conjugal visits.

In *Cherosky,* the employees did not point to any discrete, discriminatory act that occurred within the period of limitations.  *See Cherosky*, 330 F.3d at 1245.  The court in *Cherosky* concluded, however, that if an employee's new request for a respirator were denied pursuant to the same policy, the time period would begin to run anew, despite an earlier denial.  *See id.* at 1248.  The situation contemplated in *Cherosky* is exactly the situation here:  Pouncil's request for a conjugal visit with his wife in 2008 was denied pursuant to the same policy as the denial in 2002, so that the time period should be found to run anew from the later denial, despite an

earlier denial. In other words, the "heart" of Pouncil's claims, like the "heart" of the plaintiffs' complaint in *Cherosky*, "does not stem from the policy regarding the [denial of conjugal visits to LWOP prisoners], but rather from the individualized decisions that resulted from implementation of a policy originating from [the CDCR]." *Cf. id.* at 1247. As in *Cherosky*, "these individualized decisions are best characterized as discrete acts, rather than as a pattern or practice of discrimination." *Id.* The difference between Pouncil's claim and the plaintiffs' claims in *Cherosky* is that his individualized decision in 2008 fell within the limitations period.

Again, in *Ngo*, the plaintiff did not allege a second adverse decision. Instead, Ngo alleged one decision announced at the conclusion of a hearing, that he would be unable to participate in "special programs." That decision was followed by Ngo's request to participate in baseball, which was granted. Ngo's additional query about participation in other "special programs" was deferred until a further request was actually made. *See Ngo*, 539 F.3d at 1109. Thus, *Ngo* involved one adverse decision followed by one positive decision and a statement that no decision would be made regarding other matters until a specific request was made. *Id.*

In contrast to the plaintiffs in *Rick*, *Knox*, *Cherosky*, and *Ngo*, the district judge found that Pouncil has alleged a second adverse decision that is independently wrongful within the limitations period. In addition to showing proper deference to the district court's factual finding that Pouncil had alleged a current violation and injury, *see Hells Canyon Pres. Council*, 403 F.3d at 691, our determination that the 2008 denial of Pouncil's request for conjugal visits was a

separate, discrete, and independently wrongful act is consistent with prior cases analyzing the application of *Morgan*'s "discrete act" language. *See, e.g., Cherosky*, 330 F.3d at 1245-47; *Ngo*, 539 F.3d at 1109-1110. Those cases lead to the conclusion that each wrongful act starts a new clock for filing a claim alleging that act. Such a determination also fits with *Morgan*'s rule that the existence of past acts and the claimant's prior knowledge of their occurrence does not bar a claimant from filing claims about related discrete acts, so long as the subsequent acts are independently wrongful and claims alleging those acts are themselves timely filed. *Morgan*, 536 U.S. at 113.[6]

While *Knox* may, at first blush, appear to support a finding that the second denial was merely a consequence of the first denial, upon a closer reading, it does not support or require such a finding, because it is distinguishable for the reasons stated above. Furthermore, *Knox* does not require the conclusion that multiple denials of rights pursuant to the same prison policy are necessarily just effects of the original discriminatory act, because *Knox* was decided before the Supreme Court's development of the discrete act analysis in *Morgan,* and also prior to this court's application of the discrete act analysis to a prisoner's § 1983 case in *Ngo*.

Finally, the district court's decision in the similar case of *Henderson v. Hubbard*, 2010 WL 599886 (E.D. Cal. Feb. 18, 2010) (slip op.) (findings and recommendations of magistrate judge), is neither binding nor persuasive. In *Henderson*, the

---

[6] Further, although we need not decide the issue, in those cases where the filing period is not jurisdictional, the doctrines of estoppel, waiver, and laches may still operate to ameliorate the specter of any excesses that may be raised by this opinion. *See Morgan*, 536 U.S. at 121.

plaintiff was a prisoner who complained in 2006 about the same regulation at issue here, which prohibited conjugal visits for him, because he was serving life sentences on which no parole date had been set by the Board of Prison Terms. *Henderson*, 2010 WL 599886 at *1 n.2. The district court concluded that the prisoner had been aware of the policy in June of 1998, when he was denied overnight visits with his wife, and that the statute of limitations began to run "when he became aware of the reason his conjugal visits were denied." *Id.* at *2. However, unlike the district court in Pouncil's case, the district court in *Henderson* did not apply or discuss *Morgan, Cherosky*, or *Ngo*, all of which, for reasons discussed above, suggest a different outcome—that is, that a later denial pursuant to the same policy is an independently wrongful "discrete act" that starts the statute of limitations running, notwithstanding a prior denial.[7]

### 3. CONCLUSION

Because Pouncil's claims are based on an independently wrongful, discrete act in 2008, the denial of his request for conjugal visits with his second wife, Pouncil's claims are not time-barred, notwithstanding the denial, pursuant to the same regulation, of his prior request for conjugal visits with his first wife in 2002.

**AFFIRMED.**

---

[7] Also, unlike Pouncil, the plaintiff in *Henderson* did not oppose the defendants' motion to dismiss. *Henderson*, 2010 WL 599886 at *1. Thus, although *Henderson* presented the same issues as this case, those issues were never considered in *Henderson* in a contested proceeding.